SCOTT ERIK ASPHAUG
United States Attorney
District of Oregon
**LEAH K. BOLSTAD, OSB #052039**
Leah.Bolstad@usdoj.gov
**LEWIS S. BURKHART, OSB #082781**
Lewis.Burkhart@usdoj.gov
**PARAKRAM SINGH, OSB #134871**
Parakram.Singh@usdoj.gov
Assistant United States Attorneys
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **3:19-cr-00333-IM** |
| **v.** | **GOVERNMENT'S TRIAL MEMORANDUM** |
| **RONALD CLAYTON RHODES and LORENZO LARON JONES,** | |
| **Defendants.** | |

The United States of America hereby submits the following trial memorandum setting forth the factual nature and legal aspects of the trial in this case.

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

# TABLE OF CONTENTS

I.    PROCEDURAL HISTORY AND STATUS OF THE CASE ........................................ 8

    A.    Third Superseding Indictment.......................................................................... 8

    B.    VICAR Counts Re-Indicted and Joined ........................................................ 9

    C.    Trial Status .................................................................................................... 9

II.    THE ENTERPRISE CHARGES .................................................................................. 9

    A.    RICO Conspiracy (1962(d)) vs. Substantive RICO (1962(c)).................... 9

    B.    Count One – RICO Conspiracy ................................................................. 11

        1.    Enterprise ........................................................................................ 12

        2.    Interstate Commerce ....................................................................... 14

        3.    Conspiratorial Agreement ............................................................... 15

        4.    Pattern of Racketeering Activity ..................................................... 16

        5.    Unanimity as to Type or Types of Racketeering Activity ............... 19

    C.    VICAR Murder Counts 2, 5, and 11 .......................................................... 19

III.    STATEMENT OF FACTS ......................................................................................... 21

    A.    The Hoover Criminal Gang Enterprise ...................................................... 21

    B.    Defendants Jones and Rhodes are Enterprise Members ............................ 25

    C.    Pattern of Racketeering Activity................................................................ 26

        1.    Threats and Acts Involving Murder (Murder, Conspiracy, Attempt).................. 27

        2.    Acts and Threats Involving Robbery ............................................... 44

        3.    Dealing in Controlled Substances ................................................... 47

        4.    Other Crime that is Not Racketeering .............................................. 49

IV.    EVIDENTIARY ISSUES ......................................................................................... 50

    A.    FRE 1006 – Government Summary Exhibits ............................................ 50

    B.    Cell Tower Location Information ................................................................ 51

    C.    Co-Conspirator Statements (801(d)(2)(E)) ............................................... 52

    D.    Stipulations ................................................................................................. 56

    E.    Forfeiture of Firearms ................................................................................ 56

        1.    Forfeiture Authority ......................................................................... 57

        2.    Forfeiture Phase of the Trial ............................................................ 58

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                                                 Page(s)

*Bourjaily v. United States*, 483 U.S. 171 (1987) ........................................................52

*Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219 (5th Cir. 2010) ....................................10

*Garlington v. O'Leary*, 879 F.2d 277 (7th Cir. 1989)............................................53, 55

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs.*, 62 F.3d 967 (7th Cir. 1995)........10

*Napoli v. United States*, 45 F.3d 680 (2d Cir. 1995) ...................................................10

*Odom v. Microsoft Corporation*, 486 F.3d 541 (9th Cir. 2007) ..................................20

*OKI Semiconductor Company v. Wells Fargo Bank*, 298 F.3d 768 (9th Cir. 2002) ....................11

*Salinas v. United States*, 522 U.S. 52 (1997)........................................................ *passim*

*Sedima, S.P.R.L v. Imrex Co*, 473 U.S. 479 (1985) ....................................................16

*Sendejas v. United States*, 428 F.2d 1040 (9th Cir. 1970) ..........................................53

*Smith v. Berg*, 247 F.3d 532 (3d Cir. 2001)...............................................................10

*United States v. Abbell*, 271 F.3d 1286 (11th Cir. 2001)............................................11

*United States v. Ali*, 619 F.3d 713 (7th Cir. 2010)......................................................59

*United States v. Ammar*, 714 F.2d 238 (3d Cir. 1983).................................................54

*United States v. Applins*, 637 F.3d 59 (2d Cir. 2011) ...........................................10, 17

*United States v. Arambula-Ruiz,* 987 F.2d 599 (9th Cir. 1993).....................................53

*United States v. Arias-Villanueva*, 998 F.2d 1491 (9th Cir. 1993).................................55

*United States v. Ashman*, 979 F.2d 469 (7th Cir. 1992) ..............................................15

*United States v. Baez*, 349 F.3d 90 (2d Cir. 2003)......................................................50

*United States v. Banks*, 514 F.3d 959 (9th Cir. 2008) ................................................20

*United States v. Bingham*, 653 F.3d 983 (9th Cir. 2011)...............................13, 17, 20

*United States v. Blinder*, 10 F.3d 1468 (9th Cir. 1993) ...................................................17

*United States v. Boyle*, 556 U.S. 938; 129 S.Ct. 2237 (2009) .................................13, 20

*United States v. Browne*, 505 F.3d 1229 (11th Cir. 2007)...........................................10

*United States v. Busher,* 817 F.2d 1409 (9th Cir. 1987)...............................................57

*United States v. Camez*, 839 F.3d 871 (9th Cir. 2016) ................................................28

*United States v. Carlock*, 806 F.2d 535 (5th Cir. 1986) ..............................................15

*United States v. Christensen*, 828 F.3d 763 (9th Cir. 2015) .............................15, 27, 57

*United States v. Crespo de Llano*, 838 F.2d 1006 (9th Cir. 1987)...............................53

*United States v. Crockett*, 979 F.2d 1204 (7th Cir. 1992) .....................................15, 19

*United States v. Cruz*, 805 F.2d 1464 (11th Cir. 1986) ...............................................28

*United States v. De Peri*, 778 F.2d 963 (3d Cir. 1985)................................................51

*United States v. Delatorre*, 157 F.3d 1205 (10th Cir. 1998) .......................................28

*United States v. Delgado*, 401 F.3d 290 (5th Cir. 2005) .............................................14

*United States v. Dencklau*, 3:18-cr-00319-MO (D. Or)................................................12

*United States v. Dhinsa*, 243 F.3d 635 (2d Cir. 2001)................................................20

*United States v. Diaz*, 176 F.3d 52 (2d Cir. 1999)......................................................20

*United States v. Dixon*, 562 F.2d 1138 (9th Cir. 1977) ...............................................53

*United States v. Doerr*, 886 F.2d 944 (7th Cir. 1989) .................................................28

*United States v. Dolney*, 2005 WL 1076269, at *10 (E.D.N.Y. May 3, 2005)...............59

*United States v. Dorn,* 561 F.2d 1252 (7th Cir. 1977).................................................54

*United States v. Driver*, 535 F.3d 424 (6th Cir. 2008).................................................10

*United States v. Eaglin*, 571 F.2d 1069 (9th Cir. 1977)...............................................54

*United States v. Elliott*, 571 F.2d 880 (5th Cir. 1978) .................................................15

*United States v. Fabel*, 2007 WL 731300, at *1 (W.D. Wash. Feb. 16, 2007) ...........................50

*United States v. Feldman*, 853 F.2d 648 (9th Cir. 1988) ...................................................59

*United States v. Fernandez*, 388 F.3d 1199 (9th Cir. 2004) .....................................................12, 16

*United States v. Fiander*, 547 F.3d 1036 (9th Cir. 2008) ...................................................10

*United States v. Fleishman*, 684 F.2d 1329 (9th Cir. 1982) ...................................................52

*United States v. Fowler,* 535 F.3d 408 (6th Cir. 2008)...................................................10

*United States v. Frega,* 179 F.3d 793 (9th Cir. 1999) ...................................................9, 19

*United States v. Glecier*, 923 F.2d 496 (7th Cir. 1991) ...................................................10, 19

*United States v. Gordon*, 844 F.2d 1397 (9th Cir. 1988)...................................................52

*United States v. Gray*, 137 F.3d 765 (4th Cir. 1998) ...................................................14

*United States v. Gutierrez*, 48 F.3d 1134 (10th Cir. 1995)...................................................54

*United States v. Hatfield*, 795 F. Supp. 2d 219 (E.D.N.Y. 2011) ...................................................59

*United States v. Hein*, 395 Fed. Appx 652 (11th Cir. 2010)...................................................10

*United States v. Houston*, 648 F.3d 806 (9th Cir. 2011)...................................................20

*United States v. Ivanchukov*, 405 F. Supp. 2d 708 (E.D. Va. 2005)...................................................59

*United States v. Juvenile Male*, 118 F.3d 1344 (9th Cir. 1997)...................................................14

*United States v. Lawson*, 535 F.3d 434 (6th Cir. 2008)...................................................10

*United States v. Layton*, 720 F.2d 548 (9th Cir. 1983) ...................................................55

*United States v. Lloyd,* 807 F.3d 1128 (9th Cir. 2015) ...................................................53

*United States v. Loya*, 807 F.2d 1483 (9th Cir. 1987) ...................................................52

*United States v. Martinez*, 657 F.3d 811 (9th Cir. 2011)...................................................53

*United States v. Mason,* 658 F.2d 1263 (9th Cir.1981) ...................................................55

*United States v. Melton*, 689 F.2d 679 (7th Cir. 1982)...................................................15

*United States v. Monsanto*, 491 U.S. 600 (1989)................................................................57

*United States v. Newman*, 659 F.3d 1235 (9th Cir. 2011) ...............................................57

*United States v. Nixon*, 418 U.S. 683 (1974) .............................................................53, 54

*United States v. Overstreet*, No. 1:11-CR-00207-BLW, 2012 WL 5969643,
    at *17 (D. Idaho Nov. 29, 2012) .......................................................................59

*United States v. Palacios*, 677 F.3d 234 (4th Cir. 2012) ................................................49

*United States v. Phillips*, 239 F.3d 829 (7th Cir. 2001)..................................................21

*United States v. Phillips*, 874 F.2d 123 (3d Cir. 1989) ..................................................19

*United States v. Pimentel*, 346 F.3d 285 (2d Cir. 2003) ...............................................20

*United States v. Pipkins*, 378 F.3d 1281 (11th Cir. 2004) ............................................10

*United States v. Posada-Rios*, 158 F.3d 832 (5th Cir. 1998) ........................................10

*United States v. Quintanilla*, 2 F.3d 1469 (7th Cir. 1993).............................................10

*United States v. Rahman*, 189 F.3d 88 (2d Cir. 1999) ...................................................21

*United States v. Read*, 658 F.2d 1225 (7th Cir. 1981) ..................................................54

*United States v. Rubino*, 431 F.2d 284 (6th Cir. 1970)..................................................51

*Russello v. United States,* 464 U.S.16 (1983) ...............................................................57

*United States v. Salerno*, 108 F.3d 730 (7th Cir.1997)..................................................50

*United States v. Schmit*, 881 F.2d 608 (9th Cir. 1989) .............................................52, 53

*United States v. Shyrock*, 342 F.3d 948 (9th Cir. 2003) ...........................................14, 17

*United States v. Smith*, 413 F.3d 1253 (10th Cir. 2005) ................................................10

*United States v. Smith*, 770 F.3d 628 (7th Cir. 2014) ....................................................59

*United States v. Spawr Optical Research, Inc.*, 685 F.2d 1076 (9th Cir. 1982)............52

*United States v. Starrett*, 55 F.3d 1525 (11th Cir. 1995)...............................................10

*United States v. Sutherland*, 656 F.2d 1181 (5th Cir. 1981).....................................15, 19

**Government's Trial Memorandum**                                           **Page 6**

*United States v. Taylor*, 617 Fed. Appx. 671 (9th Cir. 2015)........................................................49

*United States v. Tille*, 729 F.2d 615 (9th Cir. 1984)..........................................................10, 17, 55

*United States v. To*, 144 F.3d 737 (11th Cir. 1998).........................................................................10

*United States v. Tse*, 135 F.3d 200 (1st Cir. 1998)................................................................21, 26, 50

*United States v. Turkette*, 452 U.S. 576 (1981) .............................................................................12

*United States v. Useni*, 516 F.3d 634 (7th Cir. 2008)......................................................................10

*United States v. Viola*, 35 F.3d 37 (2d Cir. 1994)............................................................................10

*United States v. Wilkes*, 662 F.3d 524 (9th Cir. 2011)......................................................................58

*United States v. Williams*, 989 F.2d 1061 (9th Cir. 1993)..........................................................53, 54

*United States v. Williams*, 2017 WL 4310712, at *13 (N.D. Cal. Sept. 28, 2017).......................50

*United States v. Wilson*, 116 F.3d 1066 (5th Cir. 1997) ...............................................................21

*United States v. Wong*, 40 F.3d 1347 (2d Cir. 1994)......................................................................28

*United States v. Yarbrough*, 852 F.2d 1522 (9th Cir. 1988)..............................................53, 54, 55

*United States v. Zavala-Serra*, 853 F.2d 1512 (9th Cir. 1988)......................................................52

I.    **PROCEDURAL HISTORY AND STATUS OF THE CASE**

A.    **Third Superseding Indictment**

On December 19, 2019, the grand jury issued a third superseding indictment ("SSI3")

charging defendants Ronald Rhodes and Lorenzo Jones in Count 1 with a RICO Conspiracy

from 1989 to December 2019. (ECF No. 119). The charged enterprise is the Hoover Criminal

Gang ("HCG"), and the SSI3 charged defendants with, among other things, conspiring to

conduct or participate in, directly or indirectly, the affairs of the Hoover enterprise through a

pattern of racketeering activity consisting of multiple acts involving murder, robbery, and

dealing in controlled substances.

Defendant Jones is charged in three related counts concerning the July 1998 murder of

Ausencio Garcia: Murder in Aid of Racketeering (Count 2), Using/Carrying a Firearm During a

Crime of Violence (Count 3), and Causing Death Through Use of a Firearm (Count 4).

Additionally, defendant Jones is charged in three related counts concerning the September 2017

murder of Wilbert Butler: Murder in Aid of Racketeering (Count 5), Using/Carrying a Firearm

During a Crime of Violence (Count 6), and Causing Death Through Use of a Firearm (Count 7).

Defendant Rhodes is charged in three related counts concerning the December 2015 murder of

Kyle Polk: Murder in Aid of Racketeering (Count 11), Using/Carrying a Firearm During a Crime

of Violence (Count 12), and Causing Death Through Use of a Firearm (Count 13).

In June 2020, Judge Mosman granted the government's motion to join this RICO

prosecution with a separately pending firearm case on defendant Lorenzo Jones (3:18-CR-

00434-MO). (ECF No. 119). The three firearm counts in the 2018 case are each alleged as overt

acts in the RICO prosecution. SSI3 ¶¶ 38, 41, 42.

### B.    VICAR Counts Re-Indicted and Joined

On April 20, 2022, the grand jury issued a three-count indictment under a new case number 3:22-cr-00137-IM. The indictment charged the same three VICAR counts already alleged in the pending RICO case (19-cr-00333-IM) but amended the mental state to clarify these were "intentional" murders. On May 27, 2022, the government filed an unopposed motion to join these three counts with the pending 2019 RICO case, replacing VICAR counts 2, 5, and 11. (ECF No. 326). This motion remains pending.

### C.    Trial Status

An eight-week jury trial is scheduled to commence on August 22, 2022. The government expects to call approximately 150 witnesses and offer approximately 250 exhibits.[1] Contemporaneously with the filing of this memorandum, the United States is filing an initial exhibit list, witness list and proposed verdict form.

## II.    THE ENTERPRISE CHARGES

### A.    RICO Conspiracy (1962(d)) vs. Substantive RICO (1962(c))

A RICO Conspiracy, as alleged in Count 1 pursuant to Title 18, United States Code, Section 1962(d), is different from a substantive RICO offense in violation of Title 18, United States Code, Section 1962(c). To convict a defendant on the charged RICO conspiracy offense in Count 1, the government is <u>not</u> required to prove that any defendant or any conspirator actually committed, caused, or aided and abetted any racketeering act. *See United States v. Frega* 179 F.3d 793, 810 (9th Cir. 1999). Moreover, it is not necessary that the objectives or purposes of the conspiracy have been achieved or accomplished. The ultimate success or failure of the

---

[1] The number of exhibits and witnesses depends on certain rulings from this Court on motions in limine. The government anticipates that several stipulations may be reached which would also reduce the number of needed witnesses.

**Government's Trial Memorandum**                                                    **Page 9**

conspiracy is irrelevant. Rather, the conspiratorial agreement to commit a RICO offense is the essential aspect of a RICO conspiracy offense. *Salinas v. United States*, 522 U.S. 52, 62-65 (1997) ("The RICO conspiracy provision, then, is even more comprehensive than the general conspiracy offense in [18 U.S.C.] § 371."); *see also United States v. Glecier*, 923 F.2d 496, 500 (7th Cir. 1991); *United States v. Tille,* 729 F.2d 615, 619 (9th Cir. 1984).

Another important distinction is that a substantive RICO offense requires proof that the defendant personally participated in the operation or management of the enterprise, whereas such proof is not required to establish a RICO conspiracy offense. A defendant may be convicted of a RICO conspiracy offense even if he did not personally participate in the operation or management of the enterprise when the evidence establishes that the defendant knowingly agreed to facilitate a scheme which, if completed, would constitute a RICO substantive violation involving at least one conspirator who would participate in the operation or management of the enterprise.[2] "If the government can prove an agreement on an overall objective, it need not prove

---

[2] *Salinas v. United States*, 522 U.S. 52, 62-65 (1997); *United States v. Applins*, 637 F.3d 59, 71-76 (2d Cir. 2011); *United States v. Hein*, 395 Fed. Appx 652, 654-56 (11th Cir. 2010) *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 239-240 (5th Cir. 2010); *United States v. Fiander*, 547 F.3d 1036, 1041-1042 (9th Cir. 2008); *United States v. Lawson*, 535 F.3d 434, 445 (6th Cir. 2008); *United States v. Driver*, 535 F.3d 424, 432 (6th Cir. 2008); *United States v. Fowler,* 535 F.3d 408, 420 (6th Cir. 2008); *United States* v. *Useni*, 516 F.3d 634, 646-648 (7th Cir. 2008); *United States v. Browne*, 505 F.3d 1229, 1265 (11th Cir. 2007); *United States v. Smith*, 413 F.3d 1253, 1272-1273 (10th Cir. 2005); *United States v. Pipkins*, 378 F.3d 1281, 1288 (11th Cir. 2004); *Smith v. Berg*, 247 F.3d 532, 537-38 (3d Cir. 2001); *United States v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998); *United States v. To*, 144 F.3d 737, 744 (11th Cir. 1998); *MCM Partners, Inc. v. Andrews-Bartlett & Assocs.*, 62 F.3d 967, 979 (7th Cir. 1995); *United States v. Starrett*, 55 F.3d 1525, 1547-48 (11th Cir. 1995); *Napoli v. United States*, 45 F.3d 680, 683-84 (2d Cir. 1995); *United States v. Viola*, 35 F.3d 37, 42-43 (2d Cir. 1994); *United States v. Quintanilla*, 2 F.3d 1469, 1484-85 (7th Cir. 1993).

a defendant personally agreed to commit two predicate acts." *United States v. Abbell*, 271 F.3d 1286, 1299 (11th Cir. 2001), *cert. denied*, 537 U.S. 813 (2002).

"If a RICO conspiracy is demonstrated, all conspirators are liable for the acts of their co-conspirators." *OKI Semiconductor Company v. Wells Fargo Bank*, 298 F.3d 768, 775 (9th Cir. 2002). No overt act is required to satisfy a RICO conspiracy. *Salinas*, 522 U.S. at 63. The Government is not required to prove that each conspirator agreed that he would be the one to commit two predicate acts. *Id*. It is not necessary to prove any substantive RICO violations ever occurred as a result of the conspiracy. *OKI Semiconductor*, 298 F.3d at 774-75. The agreement to violate the RICO statute "need not be express as long as its existence can be inferred from the words, actions, or interdependence of activities and persons involved." *Id*.

In short, to establish the RICO conspiracy, the government must prove that defendants knowingly joined a conspiracy the objective of which was to operate an enterprise through a pattern of racketeering activity, as discussed below.

### B.    Count One – RICO Conspiracy

In order to convict a defendant of a RICO conspiracy, the government must prove beyond a reasonable doubt "four" listed elements. However, each of these four elements contain several significant sub-parts. Given the complexity of this charge, the government is providing in this memo the legal framework underpinning each element because that is the scaffolding upon which Rule 401 and 403 relevance decisions will be made at trial. The "four" elements are as follows:

(1) First, there was an agreement between two or more persons to conduct or to participate, directly or indirectly, in the affairs of the enterprise (here, the Hoover Criminal Gang) through a pattern of racketeering activity;

(2) Second, the enterprise would engage in, or its activities would affect, interstate or foreign commerce;

(3) Third, the defendant became a member of the conspiracy knowing of its object and personally agreeing and intending to help further or facilitate the scheme; and

(4) Fourth, the defendant knew or contemplated that one or more members of the conspiracy, not necessarily the defendant, would commit at least two acts of racketeering in furtherance of the conspiracy.

*See Salinas v. United States*, 522 U.S. 52, 62-65 (1997); *United States v. Fernandez*, 388 F.3d 1199, 1223 (9th Cir. 2004); 9th Cir. Crim Jury Instr. 18.18 (2022) regarding the substantive RICO offense, 18 U.S.C. § 1962(c); *United States v. Dencklau*, 18-cr-00319-MO (D. Or), Jury Instruction 23 (ECF No. 790).

### 1. Enterprise

An enterprise is a group of people who have associated together for a <u>common purpose</u> of engaging in a course of conduct over a period of time. This group of people, in addition to having a common purpose, must have an <u>ongoing organization</u>, either formal or informal. 9th Cir. Crim. Jury Instr. § 18.9 (2022); *United States v. Turkette*, 452 U.S. 576, 583 (1981). Here, it is alleged that over the course of a 30-year period, the purposes of the Hoover Criminal Gang enterprise included: (a) enriching members through criminal acts like murder, assault, robbery, sex trafficking[3] and drug distribution; (b) preserving and protecting power and territory; (c) preventing and retaliating against acts of violence perpetrated by rivals; (d) keeping victims in

---

[3] While sex trafficking is listed in the indictment as a racketeering activity, the government does not anticipate presenting evidence of federal criminal sex trafficking (18 USC 1591) as one of the types of racketeering activity for which we are seeking unanimity in Count 1. At the same time, the government anticipates witness testimony to describe Hoover members engaging in promoting and compelling prostitution as evidence relevant to the nature of the enterprise and the common purpose. *See infra* Section III.C.4.

fear of the enterprise; and (e) promoting and enhancing the reputation and standing of the enterprise. SSI3 ¶ 18.

The government intends to prove up the <u>common purpose</u> sub-element by witness testimony of ex-Hoover gang members. *See infra* Section III.A. Each witness' account of the enterprise's goals, and the manner and means used to accomplish those goals, is not cumulative; rather, each individual's account is essential to establish that the purposes were, in fact, well-known and common. Further, it is alleged that Hoover members accomplished these purposes largely by using and threatening violence with firearms. SSI3 ¶ 19.

Witness testimony and other evidence will also establish the Hoover Criminal Gang as an <u>ongoing organization</u>, with a formal structure that far exceeds the low threshold for "organization" as defined by the Supreme Court. Indeed, the Supreme Court has enunciated that an association-in-fact enterprise need not adhere to a formalized structure with specific roles or command chain. The Court explained:

> While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence. Nor is the statute limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example, a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach.

*United States v. Boyle*, 556 U.S. 938, 948, 129 S.Ct. 2237, 2245-46 (2009); *see also United States v. Bingham*, 653 F.3d 983, 992-93 (9th Cir. 2011) (despite changes in enterprise structure over time, predicate acts remained related to the enterprise and the goals the enterprise maintained, thus sustaining conviction under RICO); 9th Cir. Crim. Jury Instr. § 18.18 (2022) ("An enterprise need not be a formal entity such as a corporation and need not have a name, regular meetings, or established rules."). Here, as discussed below, the Hoover Criminal Gang had a governing book

**Government's Trial Memorandum**                                                    **Page 13**

of principles; a system of entry and exit; a basic hierarchy of members; gang member naming

lineages; regular meetings; and associated colors, signs and symbols.

### 2. Interstate Commerce

The government must prove the Hoover Criminal Gang enterprise was engaged in or had

an effect on interstate commerce. Interstate commerce includes the movement of goods, services,

money, and individuals between states. These goods can be legal or illegal. Only a *de minimis*

effect on commerce is required and the effect need only be probable or potential, not actual.

*United States v. Shyrock*, 342 F.3d 948, 985 (9th Cir. 2003); *United States v. Juvenile Male*, 118

F.3d 1344, 1348 (9th Cir. 1997); *see also United States v. Delgado*, 401 F.3d 290, 297 (5th Cir.

2005); *United States v. Gray*, 137 F.3d 765, 773 (4th Cir. 1998). It is not necessary to prove that

the defendant's own acts affected interstate commerce as long as the enterprise's acts had such

effect.

In this case, Hoover members relied on one primary tool to accomplish their enterprise

purposes of enriching members, protecting power, and promoting Hoover standing: firearms.

The government seized at least 17 firearms from Hoover enterprise members over time. Each

firearm traveled in interstate commerce prior to being used in Oregon. Additionally, in using

these firearms in Oregon shootings, Hoover members used ammunition manufactured out-of-

state. The evidence will also show Hoover members engage in internet "gang banging" which

involves using interstate social media platforms to threaten or intimidate rivals. *See e.g.* Govt.

Ex. 25 (KC Food Market Video)(showing CD1 and fellow Hoover members in a video posturing

against rival gang members in a public setting, the parking lot of a mini-mart). Defendant

Rhodes rented a vehicle and used it to move interstate before, during, and after the December

**Government's Trial Memorandum**                                    **Page 14**

2015 Polk homicide. Hoover members sold heroin, cocaine, methamphetamine and prescription

pills – drugs made outside the State of Oregon whose sale certainly impacts interstate commerce.

### 3. Conspiratorial Agreement

To establish the requisite conspiratorial agreement, the government is not required to

prove that each co-conspirator explicitly agreed with every other co-conspirator to commit the

substantive RICO offense, knew all his fellow conspirators, or was aware of all of the details of

the conspiracy. Rather, to establish sufficient knowledge, it is only required that the defendant

knew the general nature and common purpose of the conspiracy and that the conspiracy extended

beyond his individual role. *United States v. Christensen*, 828 F.3d 763, 780-81 (9th Cir. 2015),

*as amended on denial of reh'g* (July 8, 2016). The requirement of a common purpose may be

met so long as the defendants were "each aware of the essential nature and scope of [the]

enterprise and intended to participate in it." *Id*.

The elements of a RICO conspiracy, such as the conspiratorial agreement, the

defendants' knowledge of it, and the defendants' participation in the conspiracy, may be inferred

from circumstantial evidence. For example, when the evidence establishes that the defendant and

at least one other conspirator committed several racketeering acts in furtherance of the charged

enterprise's affairs, the jury may infer the existence of the requisite agreement to commit a RICO

offense.[4] Additionally, the jury may infer each trial defendant knowingly participated in the

---

[4] *See*, *e.g.*, *United States v. Ashman*, 979 F.2d 469, 492 (7th Cir. 1992); *United States v. Crockett*, 979 F.2d 1204, 1208-09 (7th Cir. 1992); *United States v. Carlock*, 806 F.2d 535, 547 (5th Cir. 1986); *United States v. Melton*, 689 F.2d 679, 683 (7th Cir. 1982); *United States v. Sutherland,* 656 F.2d 1181, 1187 n.4 (5th Cir. 1981); *United States v. Elliott*, 571 F.2d 880, 903 (5th Cir. 1978).

conspiratorial agreement from evidence that every CD witness who testifies was aware of the Hoover purposes of enriching members, protecting power, and promoting Hoover standing.

### 4. Pattern of Racketeering Activity

"Racketeering activity" simply means the commission of certain types of crimes. For purposes of this case, racketeering activities are "any act or threat involving murder, . . robbery, . . . which is chargeable under State law and punishable by imprisonment for more than one year; any act which is indictable under [Title 18, United States Code] sections 1581-1592 (relating to peonage, slavery, and trafficking in persons); any act which is indictable under [Title 18, United States Code] section 1951 (relating to interference with commerce by robbery). . . [and] the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance. . ." 18 U.S.C. § 1961(1).

To establish an agreement to conduct the affairs of the Hoover Criminal Gang through a "pattern of racketeering activity," the government must prove each of the following beyond a reasonable doubt:

(1) First, the defendant agreed that at least one conspirator, which may, but need not, include the defendant himself, would intentionally commit, or cause, or aid and abet the commission of <u>two or more racketeering acts</u>;

(2) Second, the acts of racketeering would be <u>related</u> to each other and have a <u>meaningful connection</u> to the enterprise; and

(3) Third, the acts of racketeering amounted to or posed a threat of <u>continued</u> criminal activity.

Joint Proposed Jury Instruction 50 (ECF No. 320) at 63, modeled on 9th Cir. Model Instr. §§ 18.10, 18.14; Seventh Circuit Pattern Jury Instructions (1999 Ed.); Eleventh Circuit Pattern Jury Instructions, § 71.1, 71.2 (2003 Ed.); *Salinas*, 522 U.S. at 62-65; *Sedima, S.P.R.L v. Imrex Co*, 473 U.S. 479, 496-97 (1985); *United States v. Fernandez*, 388 F.3d 1199, 1228-30 (9th Cir.

**Government's Trial Memorandum**                                    **Page 16**

2004), cert. denied 544 U.S. 1009 (2005); *United States v. Shyrock*, 342 F.3d 948, 987 (9th Cir.

2003); *United States v. Blinder*, 10 F.3d 1468, 1477 (9th Cir. 1993); *United States v. Tille*, 729

F.2d 615, 619-20 (9th Cir. 1984); *United States v. Applins*, 637 F.3d 59, 73-75 (2d Cir. 2011).

Relatedness

      Racketeering acts are related, thus establishing a pattern of racketeering activity, if the

acts share similar purposes, results, participants, victims, or methods of commission and are not

simply isolated events. *Bingham*, 653 F.3d at 992 (citations omitted); 9th Cir. Crim. Jury Instr.

§§ 18.10, 18.14 (2022). At trial, the evidence will establish Hoover members engaged in multiple

shootings at rivals or suspected rivals – acts involving murder. Each murder and attempted

murder shared a similar dual purpose of protecting power and promoting Hoover standing.

Failure to retaliate against rivals is a detriment to the Hoover reputation. Each shooting shared

similar participants: Hoover gang members including defendants Rhodes (2), Jones (6), CD1 (1),

CD2 (4), CD3 (2). Each murder or attempted murder targeted similar victims: rivals or suspected

rivals.

      The evidence will also establish Hoover members engaged in acts involving robbery.

Some of the robberies were committed by similar participants active for brief periods of time in

"robbery crews." All the robberies shared similar purposes: enriching Hoover members who

shared in the proceeds. Each robbery was committed using similar methods: multi-member

approaches of victims while masked and brandishing firearms. Likewise, the evidence will

establish certain Hoover members engaged in drug distribution both to enrich Hoover members

and to enhance the status of the gang. For example, online bragging about drug profits while

wearing orange and flashing Hoover ("H") gang signs:

**Government's Trial Memorandum**                                                    **Page 17**



Meaningful Connection

The government intends to establish the racketeering acts have a meaningful connection to the enterprise by showing that (a) enterprise members would be facilitated or enabled to commit murder/robbery/drug distribution by virtue of their position in the enterprise; (b) the murder/robbery/drug distribution would benefit, promote or further the Hoover enterprise; and (c) the murder/robbery/drug distribution would be authorized by the enterprise. 9th Cir. Model Jury Instr. §§ 18.10, 18.14 (2022); Joint Proposed Jury Instruction 50 (ECF No. 320) at 64.

Continuity

The third sub-element, that the racketeering activity extend over a substantial period of time or pose a threat of continued criminal activity, may be established by evidence that shows that the racketeering activity is part of a long-term association that exists for criminal purposes, or evidence that shows the racketeering activity to be the regular way of conducting the affairs of the enterprise. *Id*. Sporadic, widely separated, or isolated criminal acts do not form a pattern of racketeering activity. *Id*. Here, the evidence will show that starting with defendant Jones' attempted murder of A.M. in 1989, Hoover gang members engaged in acts involving murder,

**Government's Trial Memorandum**                                                        **Page 18**

robbery, and drug distribution throughout the next 30 years. Indeed, such conduct was the normal operating procedure for the enterprise members who were available to do so (i.e., not in custody).

### 5.  Unanimity as to Type or Types of Racketeering Activity

In order to convict the defendant of the RICO conspiracy offense, the jury's verdict must be unanimous as to which type or types of predicate racketeering activity the defendant agreed would be committed.[5] This unanimity requirement is reflected in the government's proposed Verdict Form. (ECF No. 331). The jury may find that a defendant has entered into the requisite agreement to violate RICO when the government has proven beyond a reasonable doubt that the defendant agreed with at least one other co-conspirator that <u>at least two acts</u> of the <u>type</u> or <u>types</u> of racketeering activity listed in the indictment would be committed by a member of the conspiracy, not necessarily the defendant himself, in the affairs of the enterprise. For example, two acts involving murder (murder, attempted murder, conspiracy to murder), or one act of robbery and one act of murder. *See Frega* 179 F.3d at 810, n.21; Joint Jury Instruction 47 (ECF No. 320).

### C.    VICAR Murder Counts 2, 5, and 11

A conviction under VICAR, 18 U.S.C. § 1959, requires proof of the following elements:

1. First, on or about [date], an enterprise affecting interstate commerce existed;
2. Second, the enterprise engaged in racketeering activity;
3. Third, the defendant committed the following crime of violence: murder, as defined in Jury Instruction 52; and

---

[5] *See*, e.g., *United States v. Glecier*, 923 F.2d 496, 499-500 (7th Cir. 1991); *United States v. Crockett*, 979 F.2d 1204, 1208-09 (7th Cir. 1992); *United States v. Phillips*, 874 F.2d 123, 125-28 (3d Cir. 1989); *United States v. Sutherland*, 656 F.2d 1181, 1197 (5th Cir. 1981).

    4.  Fourth, that the defendant's purpose in committing murder was to gain entrance to, or to maintain, or to increase his position in the enterprise.

9th Cir. Crim. Jury Instr. § 18.8 (2022); *see United States v. Houston*, 648 F.3d 806, 818 (9th Cir. 2011); Joint Proposed Jury Instruction 55 (ECF No. 320) at 75.

    Like a RICO conspiracy, the government must prove that the Hoovers functioned as an enterprise during the time period charged in the Indictment. The government need not prove that the organization had a formal structure; instead, it need only show that there was a common purpose, relationships among those in the enterprise, and "sufficient longevity to permit the associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946-47; *accord Bingham*, 653 F.3d at 992 (although prison gang structure changed, predicate acts remained related to the enterprise and the goals the enterprise maintained, thus sustaining conviction under RICO); *Odom v. Microsoft Corporation*, 486 F.3d 541, 551 (9th Cir. 2007) (en banc). Unlike in a RICO Conspiracy, to convict a defendant on a VICAR offense, the government does not have to prove a pattern of racketeering activity, only that the enterprise engaged in racketeering activity.

    VICAR requires proof that a defendant committed the violent crime to increase or maintain his position in the enterprise. The "motive requirement" does not require proof that a defendant's sole or primary motive was to increase or maintain his position in the enterprise. Rather, "the motive requirement is satisfied if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *United States v. Pimentel*, 346 F.3d 285, 295-96 (2d Cir. 2003) (*quoting United States v. Dhinsa*, 243 F.3d 635 (2d Cir. 2001)) (internal cites omitted); *accord United States v. Banks*, 514 F.3d 959, 968-971 (9th Cir. 2008) (violent act must be committed as an integral aspect of membership in the gang) (citations omitted); *United States v. Diaz*, 176 F.3d 52, 95 (2d Cir. 1999) (self-

promotion in a gang need not have been a defendant's only motive or even his primary concern "if the act was committed as an integral aspect of membership in the enterprise. . . Thus the motive requisite is satisfied if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership."); *see United States v. Rahman*, 189 F.3d 88, 126-27 (2d Cir. 1999) (murder consistent with goals of organization); *United States v. Tse*, 135 F.3d 200, 206 (1st Cir. 1998) (violent crime expected by reason of membership); *United States v. Wilson*, 116 F.3d 1066, 1078 (5th Cir. 1997).

General testimony as to the expectation of or importance of violence to a criminal enterprise, coupled with a specific violent act, will satisfy the motive requirement of VICAR. *See United States v. Phillips*, 239 F.3d 829, 845 (7th Cir. 2001) (general testimony about the importance of violence and specific testimony about shooting provided sufficient evidence for jury to find beyond reasonable doubt that shooting type of behavior encouraged and demanded of members of gang in order to maintain status within gang); *Wilson*, 116 F.3d at 1078-79 (defendant's membership in gang required him to respond violently to rival gang member's "poor signing etiquette").

## III.    STATEMENT OF FACTS

### A.    The Hoover Criminal Gang Enterprise

The government plans on calling six cooperating defendants (CDs) to testify about both the Hoover enterprise and criminal offenses committed by enterprise members. Four of the six witnesses were members of the Hoover Criminal Gang (CD1-CD4). CD6 was also an enterprise member because as a member of the Unthank Park Hustlers, an allied gang whose members often claimed "HoovThank." By 2016, after having worked closely with Hoover members and

leaders committing crimes, attending Hoover meetings, and hanging out almost exclusively with Hoovers, CD6 essentially was a Hoover member.

The CD witnesses participated in this 30-year RICO conspiracy during different time periods.[6] Each of these witnesses has a unique perspective on the enterprise, and together, their testimony will establish the Hoover Criminal Gang engaged in a pattern of racketeering as defined in Joint Jury Instruction 50 (Racketeering Activity Defined). Specifically, these various cooperating defendants, who participated at different times during a 30-year period, will testify that the many acts of racketeering (1) were "related" because they embraced the same or similar purposes, results, participants, victims, or methods of commission, (2) were meaningfully connected to the enterprise because the crimes either benefitted the Hoover gang or were authorized/sanctioned by it, and (3) posed a threat of "continued" criminal activity.

Witnesses will testify the Hoover Criminal Gang is a criminal street gang originally formed in Los Angeles in the 1960s as part of the Crips and known as "the Hoover Crips." In the 1990s, the Hoovers broke away from the Crips and became known as the Hoover Criminal Gang (HCG). This Hoover Criminal Gang considered Crips to be rivals. The Hoover Criminal Gang operates in California, Oregon, and Washington.

In the early 1980s, the Hoovers established a presence in Portland, Oregon. This group contained two main sets: Hoover 107 and 74 Hoover. Defendant Ronald Rhodes is a member of Hoover 107. Defendant Lorenzo Jones is a member of 74 Hoover. In Oregon, members from these two sets often refer to themselves as 1074 Hoover to show their common identity. In the

---

[6] CD1 – member from 2012 – 2020.
CD2 – member from the early 2000s – 2020.
CD3 – member from 2015 – 2021.
CD4 – member from the late 1980s until 2019.
CD6 – UPH member, but close Hoover associate, from 2006 – 2020.

**Government's Trial Memorandum**                                    **Page 22**

Portland area, Hoovers maintain several long-standing alliances with other street gangs, including two Blood sets: the Unthank Park Hustlers and Inglewood Family Bloods. The partnership with the Unthank Park Hustlers is memorialized by multiple members referring to both gangs together as "Hoovthank." Members of these allied gangs conduct criminal activity together with, and in support of, the Hoover Criminals Gang.

The Hoovers also have many rivalries in the Portland area. This includes rivalries with local Crip sets such as the Kerby Blocc Crips, Columbia Villa Crips, and Mafia Style Crips. The Hoovers are rivals with Los Angeles based Crip sets like the Rollin' 60's, Six-Deuce East Coast Crips, and the Imperial Village Crips. Hoover rivals in Portland also include original Blood sets such as the Woodlawn Park Bloods and the Loc'd Out Pirus.

The government will offer evidence of the Hoover Criminal Gang's loose hierarchical structure. There is no organizational chart and no specific officer or leader ranks. Instead, Hoover members gain power and influence through age/seniority and the amount of "work" or gang activity or crime the member performs. Older members with the highest status are referred to as Original Gangsters ("OGs") and also "shot callers." These individuals have the authority to order younger members to commit violent acts. In order to gain membership, Hoovers use an initiation process known as "jumping in" whereby Hoover members physically beat new recruits for 74 or 107 seconds, depending on the Hoover set the new recruit was invited to join.

Senior members, also called "big homies" adopt younger members, also called "little homies" to mentor them and use them to conduct business and violence on behalf of the gang. Senior members pass down versions of their moniker to junior members of the enterprise, sometimes creating multi-generational lineages. For example, defendant Ronald Rhodes is known as "Big Fly." He has several younger "little homies" in the Hoover Criminal Gang,

including "Lil Fly," "Drilla Fly," "Baby Fly," "Stoney Fly," "Dute Fly," "Lil Dute Fly," and "Stoney Flyckoon."

Witnesses will further testify that members and associates of the Hoovers would commit acts of violence to maintain status and to intimidate rivals. Participation in criminal activity by a member increased the respect accorded to that member and resulted in that member maintaining or increasing his status and position with the Hoovers. Likewise, a member's refusal to participate in criminal activity or acts of violence decreased the respect accorded to that member or associate. Senior Hoover members would provide firearms to younger Hoover members, along with orders to carry out shootings. Hoovers were expected to use violence to retaliate against any perceived slight or actual violence done to a Hoover member or ally.

In order to operate, Hoover members held meetings at which they discussed rules, internal discipline, recruiting, intelligence on rivals and suspected cooperators ("snitches") and current "work" being done by Hoover members. CD witnesses will explain that "doing work" means engaging in gang activity including shootings, robberies, and drug distribution.

Hoover members use a variety of symbols to identify themselves as Hoover and distinguish themselves from rivals. Hoovers wear orange after they rebranded themselves when they changed their name from Hoover Crips to Hoover Criminals. They wear clothing of professional sports teams that have orange as a color, especially the Houston Astros with the "H" inside of a star logo. They also wear San Francisco Giants and Baltimore Orioles gear. Hoovers also tattoo themselves with Hoover symbols such as "SF," the Houston "H" inside of star, "HCG," "74" and "107." Given the vast number of their gang enemies, the Hoovers also refer to themselves as "EBK" and "ABK" – Everybody Killers and Anybody Killers.

Hoover members use hand signs as a means of communicating they are part of Hoover, and as a way to challenge or disrespect rivals. Hoovers "throw" an "H" sign with their fingers and hands. They disrespect rivals by forming the hand sign of a rival gang, and sometimes use a middle finger to flip off the rival gang members' hand sign.

Hoovers have adopted a code of conduct or constitution of sorts called The Groove Scriptures. Govt. Ex. 36. This document provides the history of the enterprise and promotes the superiority of the Hoovers as a criminal gang. Cooperating witnesses who were Hoover gang members will explain how the Groove Scriptures provided guidance for Hoovers and offer rules and philosophical principles of "Grooving."

### B.    Defendants Jones and Rhodes are Enterprise Members

During a police contact in 1998, defendant Lorenzo Jones said he joined the 74 Hoover Crips when he was eleven years old. He said he was "jumped in" in Seattle by seven "baby gangsters." Jones described the hierarchy from "baby gangster" to "tiny gangster" to "gangster" and finally "O.G.," original gangster. At the time, Jones said he was a "gangster" and would not graduate to an "O.G." for a couple of years. Jones said he had some people under him but not enough people to be an "O.G." Jones bragged that he had put in his "work" as a baby gangster. Jones said he was not a "shot caller" yet because that was almost always reserved for "O.G.s." Jones said he frequently wears orange to show his Hoover membership. Jones said the Hoovers considered themselves *Hoover Criminals*" and are at war with all Crips. Jones added that in Portland, as of this 1998 statement, Hoovers get along with some Bloods and said some of the Bloods would go to war with them. Jones said, "*I would rob, lie, cheat, steal, and kill for me or my family . . . . and for my 'hood*.'" Jones added, "*I'm a gangster for life*."

Jones has multiple Hoover tattoos to include a large "H" star on his left cheek, "HFL GANG" on his throat, "DON'T CROSS THE GROOVE" around his collar, another "H" star in the center of his chest, "HOOVA CRIMINAL" across his stomach, and "EVERYBODY KILLA" under his armpit. Multiple Hoover gang members who have been debriefed have told gang investigators that Jones is currently considered an O.G. 74 Hoover and an active leader in the gang.

Rhodes is a long-standing member of the 107 Hoovers in Portland. Among the Hoovers, he is known as "Big Fly." Rhodes is a "big homie" to several Portland Hoovers. During his 2016 arrest for DCS and Felon in Possession of a Firearm, Rhodes admitted that he was "Big Fly" from 107 Hoover. He told investigators he had been a Hoover Criminal Gang member for over ten years. He said he had multiple Hoover gang tattoos and had knowledge of other Hoover gang members. Rhodes told police he knew he would have to fight other rival gang members when lodged into jail because he was a Hoover.

### C.     Pattern of Racketeering Activity

The government has various avenues of proof available to satisfy its burden of proving a pattern of racketeering activity. The essence of the crime of RICO conspiracy is the agreement itself, not any specific racketeering acts. A defendant in a RICO conspiracy only has to *agree* to *types* of racketeering activity. *See Salinas*, 522 U.S. at 477; Joint Proposed Jury Instruction 47 (ECF No. 320) at 58. In the indictment, the government has identified three types of racketeering activity (or schemes) in which the enterprise members participated – murder, robbery, and dealing in controlled substances. At trial, the government will present evidence of these schemes, in addition to witness testimony about the background of the Hoovers, the purpose of the organization, and the manner and means in which the schemes were carried out. In addition,

testimony and other evidence will demonstrate that each trial defendant did in fact commit at least two racketeering acts himself, although  such proof is not required to prove a RICO conspiracy charge.

The evidence will show each defendant was a long-term member[7] of this enterprise and was personally present for criminal activity and other events including, but not limited to: Hoover meetings, planning retaliatory attacks on rivals, robberies, assaults, dealing in controlled substances, and intimidation of potential witnesses to this conduct. Although each defendant did not personally participate in every single incident alleged in the indictment, the government's evidence will prove that each defendant was aware of the essential nature and scope of the enterprise and intended to participate in it.  *See Christensen*, 828 F.3d at 781.

### 1.  Threats and Acts Involving Murder (Murder, Conspiracy, Attempt)

The vast majority of the government's case-in-chief will be evidence of threats and acts involving murder committed by Hoover Criminal Gang members including, but not limited to, defendants Jones and Rhodes.

### a.  Attempted Murder of A.M. – June 1989

On June 22, 1989, Portland Police responded to a report of a drive-by shooting at a residence in NE Portland. Police interviewed the residents, who reported an unknown black male fired multiple rounds at them while they were standing on the front porch. No individuals were struck by the bullets, but two windows were broken. Officers located a vehicle matching the description of the one described in the drive-by shooting. Officers contacted the occupants of the

---

[7] By his own admission, Lorenzo Jones was jumped into 74 Hoover in 1984 in Seattle. Ronald Rhodes has been a Hoover member since at least 2005.

**Government's Trial Memorandum**                                    **Page 27**

car, including Jones and three other subjects. All of the occupants were interviewed by police and each subject described Jones as the shooter.

Police questioned Jones and he admitted he fired six rounds in a drive-by shooting. Jones admitted he was a "Hoover 74 Crip," and told officers he knew that the residence was a hangout for "Blood" gang members. He admitted to obtaining the firearm, loading it, and shooting at the subjects on the porch. He told police he was trying to "*hit a slob*." Slob is derogatory term for a Blood gang member. Jones explained, "*I was trying to kill a slob, I didn't want to miss*." Police seized a .22 caliber pistol under the seat of the vehicle where Jones was contacted. Jones admitted the gun was his and it was the firearm used to commit to the shooting.

Although he was 17 at the time of this crime and was adjudicated in juvenile court, evidence of this pre-majority event is admissible to prove his guilt in the RICO Conspiracy because he continued to participate in the RICO Conspiracy in the years after turning 18. *United States v. Camez*, 839 F.3d 871, 874-877 (9th Cir. 2016).[8]

---

[8] The First, Second, Seventh, Tenth, and Eleventh Circuits also allow the prosecution to introduce evidence of the defendant's pre-18 acts in order to prove the defendant's guilt. *See Welch*, 15 F.3d at 1211 ("a criminal defendant's pre-majority conduct is admissible on the same bases as other evidence"); *United States v. Wong*, 40 F.3d 1347, 1367 (2d Cir. 1994) (once it is established that the defendant continued to participate in the offense after the defendant's eighteenth birthday, "the entire case can be tried in accordance with the adult rules of procedure and evidence"); *United States v. Doerr*, 886 F.2d 944, 969-70 (7th Cir. 1989) (same); *United States v. Delatorre*, 157 F.3d 1205, 1211 (10th Cir. 1998) (the defendant's pre-majority conduct is admissible on the same basis as post-majority conduct); *United States v. Cruz*, 805 F.2d 1464, 1477 (11th Cir. 1986).

### b. Attempted Murders in Eugene – Dec. 1993

In December 1993, Eugene police responded to two shootings – one that targeted occupants of a trailer home and one that occurred between two vehicles. Witnesses reported a group of Crips had come to Eugene from Portland, and these shootings occurred after a dispute with one of the intended targets. Lorenzo Jones was charged with state crimes including Unlawful Use of a Weapon. He went to trial in one case, was found guilty, and then pled guilty in the other case. He was sentenced to consecutive terms of 22 and 24 months' imprisonment.

During his plea colloquy, Jones admitted, "Well, December 19, I came from Portland to Eugene with some friends, and we had a confrontation with some people at a party on Bartelson Road somewhere, and I had a nine millimeter that I used to open fire into the trailer." Govt. Ex. 40. During his sentencing hearing, defendant explained himself as follows:

> I lost my father in '89, which I was 14 years old, and that was when I chose to join a gang. I assumed, you know – not assumed, but I took part, as the leader of our gang as my father, and my other homies in my gang brothers and older brothers. And between that time I tried to stop the gang two different times, not – stop banging completely, confronting my home boys and tell them no.
> I tried to tell them. There is a code which you join a gang; you never tell on your home boys, and you are in it for life, until death takes you away. I took that and accepted that and I think it was the hurt of losing my father that chose me to be that aggressive and that deep into the gang. Which is really – it is really hard to explain, because if you are not involved in it, you know, you couldn't – you would not be able to understand the hate. The anger that binds the group together. It knows that there is love there. It is a negative love. Nobody is going to hurt me, and I will die before I let somebody hurt you.

Govt. Ex. 41.

### c. Garcia Murder – July 19, 1998 [VICAR Count 2]

On July 19, 1998, Portland Police responded to a report of a shooting at the El Moro Apartments in Southeast Portland. Police found the victim, Ausencio Garcia, suffered a gunshot wound to the head. Garcia died on scene while receiving medical care. At the homicide location,

police recovered 14 9mm shell casings all clustered around one alleyway into the complex. Subsequent forensic testing revealed the 14 shell casings were fired from the same gun.

Detectives learned of a large fight at the El Moro Apartments earlier in the day in which Hoover gang member CD4 engaged in a physical fight with several Hispanic subjects. Other Hoovers came to CD4's aid, including his brother and Lorenzo Jones. As the physical altercation escalated, CD4 was struck by a beer bottle in the eye. He lost consciousness and was rushed to a local hospital where he was treated for a blow-out orbital fracture that required reconstructive surgery.

As police continued to investigate the shooting, Jones arrived and initiated contact with the police. Jones admitted being involved in the earlier fight between CD4 and "the Mexicans." He admitted he was present when CD4 was struck by the bottle. Jones also admitted he called another Hoover gang member named K.A. to come assist. After CD4 was struck by the bottle, Jones said that he and others ran from the scene. Jones said he tried to reach K.A. again because "*all hell is breaking loose*." Jones said he met with K.A. shortly thereafter. Witnesses will describe K.A. as a personal armory for Jones, a guy who would hold onto guns for Jones and bring them when called upon.

The Garcia homicide went unsolved for many years. In 2003, as part of a plea deal, K.A. confessed to his role in the crime. He pled guilty to conspiring with Jones to murder Garcia. K.A. was not present during the fight when CD4 was struck by a bottle. K.A. said he received a call from Jones, aka "Low Down," who wanted his help. Jones said that the group they were fighting "busted" [CD4] and there was blood all over Jones' car. K.A. drove his car to the apartment complex where the fight had occurred and joined him in CD4's apartment. Jones made everyone leave the apartment. K.A. and Jones drove around the apartment to the side and parked. Jones

**Government's Trial Memorandum**                                        **Page 30**

exited the car with a chrome, 9mm semiautomatic gun with a gold trigger and said "*I'll be right back*." K.A. stayed in the car. He heard multiple gunshots and saw the light flashes of the gun fire.

When Jones returned to the car he yelled "*I got him. I got him. He fell down*." Jones repeatedly said, "*I dropped him. I killed dude. I killed him*." Jones told K.A. later that he went back to the apartments to talk to the police the morning after the murder. In conversations with CD4 after this murder, Jones reassured him that he took care of that problem with "the Mexicans." While in pretrial incarceration in this case, Jones was housed next to CD6. The two discussed their cases and Jones bragged about killing a Hispanic male in 1998 by shooting him in the head with a silver 9mm handgun. Jones was angry K.A. provided information to law enforcement and claimed K.A. was not accurate about some of the details.

### d. Attempted Murder of R.T. – Oct. 2009

On October 13, 2009, PPB responded to a shooting in North Portland at which a young man (R.T.) had been shot and transported to the hospital. R.T. was a known Rollin 60s Crip gang member. Officers observed bullet strikes and blood spots on the ground at this residence. Witnesses described this as a drive-by shooting involving a vehicle with a broken out back window. CD2 will testify that he was the shooter. Prior to the shooting, he received a call from Hoover leader Leonard Brightmon who was in Seattle at the time. Brightmon informed CD2 that the 60's were in front of E.B.'s house. E.B. was a younger Hoover at this time.

CD2 knew that given this call, it was expected that he would go protect E.B. from the rival "60's" by taking a firearm and shooting at those rivals. If he did not do this "work," he would lose status and possibly face discipline from fellow Hoovers. CD2 drove a Grand Marquis with a broken out back window. When he arrived on scene, he stayed in his car and shot out his

driver's window. CD2 did not know he had hit anyone until later. E.B. tried to take credit for this shooting, and CD2 allowed that to happen to help E.B. build up his own reputation.

### e. Attempted Murder of D.P. – Dec. 2015

On December 14, 2015, police responded to a report of a drive-by shooting in Southeast Portland. Police identified the victim as D.P., a known LOP (Hoover rival) gang member. D.P. told police he associated with some Blood gang members but didn't know why he was shot. D.P. reported he had stopped at a traffic light when a subject from another vehicle started shooting. D.P. suffered a serious gunshot wound to his leg that caused heavy blood loss and another graze wound on the left side of his head. At the time of the shooting, he had been wearing a red Washington Nationals baseball cap, a symbol commonly worn by Woodlawn Park Bloods, one of the top Hoover rival gangs.

The passenger in D.P.'s vehicle told police that the front passenger in the SUV reached across and shot at them through the driver side window. Witnesses at the scene describe the vehicle driven by the shooters as a Range Rover.

Police recovered one 9mm casing and a .45 caliber casing from the scene. A subsequent comparison by a forensic scientist at the Oregon State Crime Lab revealed the 9mm shell casings recovered from the Polk homicide, described below, were fired from the same gun as the 9mm shell casing recovered from the D.P. shooting scene. The two shootings were two days apart. Cell tower evidence analysis revealed phones used by Rhodes and CD3 both accessed cell towers in the area of the D.P. shooting on December 14, 2015, at about the time of the shooting.

CD3 is expected to testify that after high-ranking Hoover Leonard Brightmon Jr. (aka "Lav," "King Lavish,") suffered non-lethal injuries from a shooting by a rival Rollin' 60's Crip on December 12, 2015, Hoovers were out "hunting" rivals to retaliate. On the evening of

December 14, 2015, CD3 was with Brightmon, Rhodes, Marcus Gant, and a fourth Hoover associate unknown to CD3. CD3 was a passenger in the white suburban being driven by Marcus Gant. Gant and CD3 were following Brightmon, who was driving his Range Rover with Rhodes and the unknown Hoover associate as passengers.

CD3 saw Brightmon driving quickly, as if in pursuit of another vehicle. CD3 then observed Brightmon pull-up beside the victim's vehicle and saw occupants of the Range Rover fire multiple rounds into the victim vehicle. Brightmon drove off westbound, and Gant followed. CD3 regrouped with Brightmon and Rhodes at Cynthia Scholer's residence in Vancouver where he observed Rhodes and Brightmon discussing the incident and washing their hands.

### f.  Polk Murder – December 16, 2015 [VICAR Count 11]

On December 16, 2015, defendant Rhodes and his "little homie" CD3 shot and killed suspected gang rival Kyle Polk. Rhodes had only very recently been released from state prison in May 2015 after serving a 96-month sentence for a Robbery in the First Degree with a Firearm conviction.

Eyewitnesses reported two subjects in a white SUV were involved in the murder. Video evidence showed Polk was shot in an unprovoked, drive-by murder. An eyewitness described an older African-American driver and a younger, lighter-complexion passenger in a white SUV. Several eyewitnesses described the younger passenger firing multiple rounds at Polk after the passenger asked Polk where he was from. After the shooting, the driver sped away from the scene. Two days after the murder, a 911 caller (K.E.) reported CD3 and Rhodes were the shooters. Police were able to obtain cell tower records for phones used by CD3 and Rhodes. The cell tower records placed the cell phones of CD3 and Rhodes in the area of the shooting at the time of the Polk murder. Cell tower records showed both phones leave the area following the

shooting and ultimately travel to Vancouver, Washington. Police recovered five 9mm shell casings from the scene.

Following the murder, Rhodes took several evasive steps. He arranged for his girlfriend to return the rented white Chevy Suburban on the night of the murder. On the day after the murder, he asked K.E. to drive him and CD3 out of town. K.E. reported Rhodes was armed with a firearm and CD3 cried while talking on the phone with his mother, telling her that he was going to prison for a long time.

CD3 is expected to testify that after Leonard Brightmon was shot (Dec. 12, 2015), Hoovers were on heightened alert and "hunting" rivals in retaliation. On December 16, 2015, CD3 and Rhodes drove in the rented white Suburban SUV, to a drug source's apartment. The drug source's apartment was located very close to the Polk murder scene. Rhodes and CD3 were sampling cocaine for a subsequent purchase when they received several calls from Corey Hudson, another high-ranking Hoover. Hudson informed CD3 that he had seen E.P. (a rival gang member), and that he wanted to do something about it, implying wanting to shoot E.P. Hudson asked Rhodes and CD3 to meet him at the Plaid Pantry located at SE 112th Avenue and SE Division, in Portland, Oregon. Rhodes and CD3 received a subsequent call from Hudson instructing them to "check out" the two males standing outside the Plaid Pantry.

CD3 is expected to testify that Rhodes drove CD3 in the rented suburban to the Plaid Pantry, where Polk and Javonni Matthew were standing. Matthew happened to be wearing a blue hoody that day (a rival gang's color). Rhodes asked Polk and Matthew where they were from, and if they banged. As they responded, Rhodes handed CD3 a Glock pistol with an extended magazine and told him to shoot. CD3 shot several times, striking Kyle Polk once, killing him at

the scene. Rhodes drove them away from the scene. He stopped at the I-205 interstate bridge where he threw the firearm in the Columbia River. It has not been recovered.

### g.   Attempted Murder of D.Pen. – Sept. 2016

On September 16, 2016, two Hoover members (CD1 and R.D.) and an allied Unthank Park Hustler (M.M.) committed a drive-by shooting at McCoy Park in Northeast Portland. The victim was a member of the Columbia Villa Crips, a rival gang of the Hoovers and Unthank Park Hustlers. The victim suffered multiple gunshot wounds to his arm, shin, and thigh. He was not able to describe the shooters because he was putting his child's car seat in a vehicle when he was struck by several bullets from behind.

Portland Police were able to interview multiple eyewitnesses who described the shooting suspects as three black males in a convertible sedan. A city bus equipped with an exterior camera captured video of the three subjects immediately after the shooting in a convertible Ford Mustang. The images gave police a suspect vehicle, which was located on September 29, 2016. Police identified the owner of the vehicle as R.D., a known Hoover Criminal gang member, and the subject of two other shooting investigations in 2015. During a search execution on the vehicle, police seized evidence linked to the other two subjects, CD1 and M.M.

Police later seized a firearm in a separate robbery investigation involving CD1 and M.M. The Oregon State Crime Lab conducted forensic ballistic analysis of a bullet fragment from the McCoy Park shooting. A forensic scientist determined the bullet fragment was fired from the gun seized from CD1's vehicle.

CD1 will testify he was playing basketball with R.D. and M.M. when they saw a rival Crip gang member, D. Pen. The three got into R.D's vehicle so CD1 could shoot D. Pen for the sole reason that D. Pen. is part of a rival gang. R.D. drove the vehicle past D. Pen. and CD1 fired

**Government's Trial Memorandum**                                      **Page 35**

several shots from a Ruger .357 at D. Pen. CD1, R.D. and M.M. then went to Hoover member Ronnie Smith's house to hide out. CD1 later saw a news article stating D. Pen. was shot and CD1 posted the article on his Facebook account to brag about the violence.

### h. Conspiracy to Commit Murder of E.H. Jr. – May 2017

In the early morning hours of May 22, 2017, multiple gunmen broke into an occupied apartment in Gresham and shot at the family inside. They struck 9-year-old L.H. in the head, neck and abdomen. He suffered significant brain and eye damage. The bullets also struck L.H.'s mother C.T. as she tried to shield him from harm in her bedroom. She even yelled at the shooters to stop because there were "babies in the room." Indeed, her 2-year-old child K.H. was also in the room, being protected by her father E.H. Jr.

E.H. Jr. is a member of the Woodlawn Park Bloods, a Hoover rival gang with whom they had an ongoing feud. A significant event in this feud was the August 2014 murder of Ervaeua Herring, the sister of E.H. Jr. and daughter of known Woodlawn Park Blood leader and shot caller E.H. Sr.

Investigators identified three active suspects – Chris Jordan, Nakiem Brown, and Rashad Banks – each of whom were Hoover members. Phone analysis revealed significant and unusual contacts between these three suspects in the hours leading up to the 4:30 a.m. shooting. Brown and Banks also had contact with two Hoover O.G.s in this same time period – Lorenzo Jones and Corey Hudson. Cell phone analysis showed that in the minutes and hours after Hoover member Ronnie Smith was shot and hit in Portland (2130 hours), both Hudson and Jones shared communication events with each other and with Nakiem Brown and Rashad Banks. Additionally, phones used by Hudson and Jones moved north on I-5 from Eugene (Jones) and Salem (Hudson) together or in tandem. Once they arrived in Portland, just hours before this retaliatory shooting

on a rival, phones used by Jones and Hudson hit off cell towers in the same coverage areas used by Brown's and Banks' phones at the same time.

Chris Jordan, Nakiem Brown and Rashad Banks were prosecuted in state court for Attempted Murder and Conspiracy to Commit Murder. A Multnomah County judge found Banks guilty on four counts of Attempted Murder. The judge found Brown guilty of Felon in Possession of a Firearm but acquitted him on the attempted murder charges. The judge acquitted Chris Jordan on all counts.

While in custody on this RICO case and housed with CD6, Jones acknowledged participating in the lead-up to this shooting. He acknowledged the evidence puts his cell phone in the area. Jones was angry that one of the state suspects implicated him (Jones) in the crime, and he was mad one suspect left behind some blood on a fence. He never denied being involved, nor did he distance himself from the Hoovers who did the shooting. Instead, Jones smiled about this event and said, "*Fuck that bitch. Fuck that kid."*

### i. Butler Murder – September 17, 2017 [VICAR Count 5]

Wilbert "Billy" Butler was murdered at 1:41 a.m. on September 17, 2017, after exiting the Kateri Park Apartments in SE Portland. During the night of September 16, 2017, and into the early morning of September 17, 2017, a female hosted a small party that included several Crip gang members and one rival Inglewood Family Blood, Joel "Jo Jo" McCool. During the party, a physical fight broke out between McCool and the Crips at the party. The government intends to call the party attendees, who are not cooperative with law enforcement. Additionally, two of the Crip members believed to be involved in the fight were murdered in 2021.

Apartment video surveillance caught McCool leaving the apartment complex at 12:50 a.m., shirtless, missing a bracelet and holding his cell phone. Immediately after leaving the

apartment complex, McCool called a more senior Inglewood Blood, Aronte Kerney Sr., several times. After connecting, Kerney called defendant Jones who then called McCool at 12:56 a.m. These calls set in motion McCool and defendant Jones seeking violent retribution against the rival Crips for the fight. Unbeknownst to McCool and defendant Jones, the Crips involved in the fight had already left the apartment complex at 12:52 a.m.

Cell site information placed McCool in the area of the Kateri Park Apartment Complex and defendant Jones in the area of 82nd Ave. and SE Holgate around 12:56 a.m. A PPB license plate reader happened to capture defendant Jones' silver Chrysler 300 at 12:47 a.m. parked at SE Raymond Court, near 82nd Ave. and SE Holgate. Cell site information showed McCool and defendant Jones moving towards each other until 1:11 a.m. when both phones hit off the same cellphone tower.

At 1:30 a.m., McCool and defendant Jones appeared on the exterior video surveillance at the Kateri Park Apartments. Defendant Jones wore distinctive clothing: black Adidas pants with reflective vertical stripes and a white t-shirt with a white reflective tiger. At 1:32 a.m., McCool and defendant Jones moved to the interior courtyard, directly below apartment hosting the party. At 1:35 a.m., McCool and Jones walked toward the north exit of the Apartment Complex. At approximately, 1:41 a.m., Butler and four other individuals got off the elevator and departed through the north exit of the apartment complex. About eight seconds later, interior surveillance caught a bullet strike the exterior door. The apartment complex did not have any surveillance cameras in a position to capture the shooting, nor the positions of the shooters or victims. The exterior video surveillance does catch McCool and defendant Jones running south on SE 28th Avenue while carrying items that are the size and shape of firearms.

**Government's Trial Memorandum**                                                    **Page 38**

PPB responded and Officer Bailey accompanied victim Butler on the way to the hospital in an ambulance. Butler told Officer Bailey that "Cousin John John" shot him with a silver handgun. Butler's family was later interviewed and stated they do not have a "Cousin John John." They said they only have a cousin named Joel "Jo Jo" McCool. Butler was pronounced dead at the hospital. An autopsy found Butler was shot eight separate times and died of gunshot wounds. The government's theory is that McCool and defendant Jones mistakenly believed Butler was one of the Crips who had disrespected McCool and then they murdered the wrong person while seeking retribution.

PPB personnel located 13 9mm shell casings in the general area to the north of the exit and 12 .40 caliber shell casings to the east of the north exit. Numerous individuals called 911 to report the shooting. One neighbor saw an African American male wearing a white shirt firing shots to the west in the location of the .40 caliber shell casings. A separate 911 caller saw two shooters, one wearing a white t-shirt and black pants and another shooter wearing red pants and no shirt. The two shooters ran south on 28th Avenue and left in a Chrysler 300.

Cell site information shows that at 1:50 a.m. both McCool and defendant Jones' phones hit off cell towers near 82nd Avenue and SE Holgate. At 3:02 a.m., defendant Jones' phone began to hit off cell towers near one of his girlfriend's house located on SE Lydia Court. On February 3, 2018, PPB executed a search warrant at this Lydia Court residence and seized a Glock .40 caliber pistol, model 22, with an extended magazine. Forensic toolmark testing later concluded the .40 caliber casings seized at the Butler crime scene in September 2017 were fired from this Glock .40 caliber pistol. DNA analysis on this firearm found a mixture of three contributors, and defendant Jones could not be excluded as one of these contributors, with a likelihood of 1.63 x $10^{15}$ (1.63 quadrillion times).

**Government's Trial Memorandum**                                          **Page 39**

At approximately 2:15 p.m. on September 17, 2018, defendant Jones' phone started traveling south to Eugene and ultimately arrived at Aronte Kerney Sr.'s residence on Brockton Place. On February 3, 2018, PPB executed a search warrant at the Brockton Place residence locating several items tying Jones to the residence, including mail and his driver's license. Officers also seized the shirt and pants matching distinctive clothes that Jones wore on the night of Butler's murder.

CD5 will testify that he worked with Jones after Jones' release from prison in approximately 2016. Jones expressed to CD5 that he was the "*King of Portland*" and Jones was angry that younger gang allies and rivals did not know his violent reputation. Jones told CD5 he was going to "*remind people*" of his violence and reestablish his dominance.

CD6 will testify about jail house admissions defendant Jones made about his involvement in the Butler murder. Particularly, Jones told CD6 that he brought guns to help McCool shoot some rival Crips in response for being jumped. Jones told CD6 about legal defenses his team will make at trial, including claiming Jones possessed an eyeglasses case captured in the video surveillance and not a firearm. Defendant Jones admitted to CD6 that he had the firearm and was trying to kill some rival Crips.

### j. Attempted Murder of D.H. – December 2, 2017

On November 18, 2017, Defendant Jones was shot in Downtown Portland at NW 4th Avenue and NW Couch. He was a passenger in a convertible Mercedes being driven by a girlfriend. The car parked near NW 4th Avenue and NW Couch, near a group of rival gang members. Defendant Jones later told cooperating defendants that he saw D.H. in the group of rival gang members. Rival gang member Alejandro Vance then crossed the street and fired numerous shots and struck Jones several times in the back and ear. Officers arrested Vance on

scene, they located the firearm he used, and Vance was subsequently convicted of the shooting in Multnomah County Circuit Court.

Jones' girlfriend drove him to the hospital where he refused to cooperate with law enforcement. Officers took photos of Jones' clothing, including a Hoover related hat and a shirt with the lettering "O.G" for "Original Gangster."

Defendant Jones held D.H. responsible for the shooting because he believed D.H. directed Vance to shoot him. During the night of December 1, 2017, D.H. was out in Eugene with his girlfriend. While out, D.H. saw Jones and immediately left the establishment, purchased some food and returned to the Bailey Apartments in Eugene. The Bailey Apartment complex video surveillance captured Jones appear in the parking lot around 1:50 a.m. at which point he hid behind a wall and waited. At approximately 1:59 a.m., D.H. walked across the parking lot and Defendant Jones appeared from hiding and fired thirteen shots at D.H. D.H. was struck five times and was transported to the hospital. D.H. survived, but he was not cooperative with law enforcement.

Cell tower information placed Jones in the area of the Bailey Apartments from 1:53 a.m. until 2:25 a.m. During PPB's search of the Brockton Place residence on February 3, 2018, officers seized a 9mm Glock 19 pistol. Subsequent forensic toolmark analysis concluded that the shell casings seized from the Bailey Apartments December 2, 2017, were fired from this 9mm Glock 19 pistol.[9]

Defendant Jones later admitted to cooperating defendants about being the person who shot D.H. Defendant Jones expressed extreme displeasure because he did not kill D.H.

---

[9] Forensic Toolmark analysis also concluded the shell casings seized from the December 23, 2017, attempted murder of J.C. were also fired from this 9mm Glock 19 pistol.

**Government's Trial Memorandum**                                    **Page 41**

### k. Attempted Murder of J.C. – December 23, 2017

On December 23, 2017, Portland Police responded to an early morning shooting at SW Stark Street and SW 3rd Avenue in Downtown Portland. Surveillance video footage of the incident shows several vehicles including a vehicle driven by a Hoover member Ronnie Smith, enter a parking lot and park. The occupants, believed to be Hoovers, are seen talking with each other. Soon thereafter, a white Mercedes sedan, occupied by J.C., a Woodlawn Park Blood, is seen driving into the same parking lot. As the Mercedes drives in, Ronnie Smith approaches the Mercedes occupied by J.C. As Smith neared the driver's side door, J.C. fired multiple rounds from his driver's seat position and struck Smith in the stomach. The video shows another suspect, later identified as Lorenzo Jones, firing about 30 rounds at J.C. as J.C. is attempting to drive away from the scene. Jones is then seen fleeing the scene in a silver Chrysler 300 sedan.

Police collected the 31 9mm shell casings from the scene and submitted them to the Oregon State Crime Lab for analysis. The 9mm shell casings were compared to the 9mm Glock semi-automatic handgun seized from the Brockton Place residence in Eugene, Oregon. A forensic scientist conducted toolmark analysis and concluded the 31 spent 9mm casings collected at the J.C. shooting scene were fired by this 9mm Glock seized at Brockton Place. This was also the same gun Jones used to shoot D.H. on December 2, 2017.

### l. Retaliation for Davonte Kearney Jr. Murder – Feb. 2018

On January 31, 2018, Hoover member Davonte Kearney Jr. ("Tae Ty") was shot and killed. He was the son of Aronte Kearney, a close associate of Lorenzo Jones. At the time of this murder, Lorenzo Jones had been arrested on January 19, 2018, for the 2017 Butler murder. This Kearney murder was a significant event in the Hoover Criminal Gang and it sparked a fervent effort by Hoovers to retaliate. For example, Hoover members Darry Smalley and Isaiah

Lawrence posted "snaps" online showing themselves holding firearms and threatening shootings on February 2, 2018.

On February 13, 2018, a funeral was held for Davonte Kearney Jr. Portland Police officers surveilled this scene. They observed many Hoover members and allies in attendance, including Corey Hudson, Leonard Brightmon, Darry Smalley, Jarone Cuie (wearing a "WK" hat for Woodlawn Killer), and Timothy Gaines (UPH). After the funeral, officers executed a traffic stop on a no-plated black Chevy SUV. Officers had seen six Hoover members and associates get inside this vehicle to leave the funeral. The occupants included (1) driver Leonard Brightmon, wearing a black and orange plaid shirt with a large photo of "Tae Ty" holding a rifle on the back; (2) Darry Smalley who was wearing a customized black hooded sweatshirt with "Verz 1074" and "Fuck Slobs" on it; (3) Corey Hudson wearing an orange and blue plaid shirt with a photo of "Tae Ty" holding an AK-47 style rifle on the back; (4) Isaiah Lawrence, (5) Michael McPherson, and (6) Dominique Moore. Officers recovered three firearms from this vehicle.

### m.  Attempted Murders by Other Hoovers – 2019

CD2 will testify that on October 27, 2019, he assisted Hoover ally Timothy Gaines., an Unthank Park Hustler, to engage in a retaliatory shooting at a suspected rival during a car chase in Eugene, Oregon. Officers who responded to this scene collected 9mm and .380 caliber spent cartridge casings. On October 29, 2019, officers stopped a vehicle occupied by CD2 and Hoover associates. Inside, they found a Taurus .380. Forensic toolmark comparison concluded the .380 casings recovered in the Eugene shooting were fired from this Taurus .380 pistol. Further investigation revealed that CD2 accompanied a female who purchased said firearm on October 22, 2019, from a pawn shop in Portland.

Later, on November 9, 2019, CD2 was driving in Portland when he suspected that he was being followed by rival gang members ("the brands"). He engaged in evasive maneuvers and then shot from his vehicle at the occupants of the pursuing car. Residential surveillance video recovered by police captures CD2's vehicle driving by at a high rate of speed after audio of multiple gunshots. A police officer observed CD2's reckless driving, and watched as CD2 bailed out of the vehicle and ran away on foot. Neighbors reported this suspect dropped a metal object into a garbage can. Inside the can, officers found a Kahr .40 caliber pistol. Additional surveillance video showed CD2 running on foot, going inside a residence as police sirens wail nearby, and then exiting the residence a short time later. Forensic toolmark analysis on the casings recovered from the shooting confirmed they were fired by this Kahr .40 caliber pistol.

### 2. Acts and Threats Involving Robbery

The government anticipates calling multiple witnesses to testify the Hoovers committed acts involving robbery. On or about February 1, 2006, Rhodes committed an armed, home-invasion robbery with two other Hoovers, Jermaine "Gamous" Brown, and Johnny "Big Tyckoon" Hudson. The victims were an Inglewood Family Blood associate who was shot in the neck and arm, and his girlfriend, who was shot in the hip. The victims were dealing drugs at the time, and it was believed that this was an attempted robbery of a drug dealer. The Hoovers entered the residence brandishing firearms and demanding money. When no money was handed over, Brown started shooting. All of the suspects wore Hoover colors orange, black, and blue, and the victims told investigators at the time they knew the robbers were from Hoover. A witness overheard one of the suspects say, "I'm gonna shoot that slob," (a derogatory term for a Blood) prior to the shooting. In 2007, Rhodes pleaded guilty to robbery in the first degree and robbery in the first degree with a firearm and was sentenced to 90 months' imprisonment.

During the summer and fall of 2016, several Hoover and Hoover associates, including CD1 and CD6, participated in numerous armed robberies of various establishments, including residences, pharmacies, convenience stores and hotels. On September 5, 2016, CD1 and CD6 participated in a home invasion robbery of a cocaine dealer who was rumored to have a large amount of money and cocaine in his house. The cocaine dealer retreated to a bathroom and was shot and killed when the cocaine dealer called 911. The group of home invasion robbers did not locate the drugs or large amount of money and made off with very little.

On September 12, 2016, CD1 and CD6 entered the Chestnut Inn, threatened the desk clerk with firearms and stole an unknown amount of money. During the robbery, CD6 believed the clerk started to reach for a baseball bat and CD6 grabbed the bat. CD6 then struck the hotel clerk several times before CD1 and CD6 ran off with an unknown amount of stolen cash.

On October 9, 2016, CD1 and CD6 entered the Milwaukie Market convenience store armed with firearms and forced the clerk into the back room. CD6 pistol whipped the clerk causing facial injuries. CD1 and CD6 stole currency and tobacco products.

On October 19, 2016, Hoover ally M.M. committed an armed robbery of a Walgreens in Portland. M.M. stole various prescription drugs including promethazine and oxycodone pills. Hours later, PPB Officer Koenig saw a vehicle and contacted the occupants. One individual ran off, but the others remained. Officer Koenig later learned that M.M. was present with a Hoover and Hoover associate, Ronnie Smith and Jimmy Pierce. A subsequent search of the vehicle located promethazine bottles and oxycodone matching the ones M.M. stole from Walgreens.

In early October 2016, Jones, CD6 and approximately seven other Hoover and Hoover associates robbed a marijuana dispensary in Eugene. The robbery was interrupted by an unknown white male, who fired gun shots at the robbers and the group escaped with

approximately ten to fifteen pounds of marijuana. This incident was not reported to law enforcement. Kerney Sr. then set up a robbery of a different marijuana grow facility approximately one week later. On October 14, 2016, Jones and several other Hoovers associates went to the Wild West marijuana grow facility. During the robbery, security guards caught the robbers and yelled at the group to stop. One of the robbers began firing shots at the security guard, who ran away and hid in blackberry bushes and called 911. Eugene Police responded and recovered shell casings but had no other leads. The robbers made off with an unknown amount of marijuana. CD6 did not participate in this robbery and was angry to be left out. Jones later admitted to CD6 to participating in the second robbery and that Jones shot at a security guard.

CD1 will testify that after committing robberies, he provided a portion of drugs and money proceeds to older Hoovers, including Ronnie Smith and Sha'kor Holiday. CD1 will testify that Hoovers are generally required to sell drugs to Hoovers and Hoover associates first and to give the Hoovers a better price. Further, selling to Hoover members and associates provided a layer of trust that they would not be robbed or killed during the drug transactions. CD6 will testify that he would sell the stolen pills to Hoover associate Aronte Kerney Sr. The older Hoovers and Hoover associates would then take the drugs and money to use to support their drug trafficking.

Hoover member CD2 will testify to committing an armed robbery in December 2019 at a marijuana dispensary with Timothy Gaines, a close ally from the Unthank Park Hustlers. CD2 committed this robbery in the same two-month period in which he and Timothy Gaines engaged in one retaliatory shooting together (October 2019 in Eugene) and one solo retaliatory shooting (November 2019 in Portland).

### 3. Dealing in Controlled Substances[10]

The government intends to offer evidence through multiple eyewitnesses that controlled substances were frequently shared, sold and distributed by Hoover members and associates to customers and other Hoover members and associates. In the late 1990s, Jones engaged in drug dealing in Portland. The El Moro Apartments, where his Hoover co-conspirators CD4 and R.R. resided, was a prime market for CD4's drug dealing business. Jones assisted CD4 in this drug trafficking by providing him with protection and helping him carry out deliveries. HCG_MISC_AEO_00630. This apartment complex was the scene of the July 1998 Garcia homicide (VICAR Count 2).

According to CD4, Hoovers like Corey Hudson and Lorenzo Jones were known as shooters and crack cocaine dealers. In general, there was no requirement that a Hoover member share a percentage of his drug proceeds with the rest of the group. However, in practice, it was expected that members would "wet the beak" of more senior members and spread drug proceeds around to other members. Such authorized and encouraged conduct enabled a Hoover member to remain in good standing.

Drug dealing by Hoovers was "meaningfully connected" to the enterprise in several ways. HCG_MISC_AEO_00629. First, many Hoovers were successful in selling drugs because people were afraid to rob them, assault them, or be in debt to them because they were part of the Hoover gang. Second, those Hoover members who excelled at making money through drug dealing often relied upon more violent Hoover members to protect them. Third, Hoover members

---

[10] Specific examples of dealing in controlled substances are provided in the SSI3 at Overt Acts 28, 35, and 43.

were expected to give fellow Hoovers good prices and fronting arrangements. This benefitted the enterprise.

The government's evidence shows that defendant Rhodes has profited from drug dealing for several years. He was arrested for the Unlawful Delivery of Cocaine in 2005, after officers recovered crack cocaine from his clothing. Rhodes told the police not to misplace the drugs because they were valuable, and he made admissions to selling the cocaine. Witnesses are expected to testify that after Rhodes was released from prison in 2015, after serving a lengthy sentence for a robbery conviction, he immediately began to sell Xanax, methamphetamine, and heroin in Portland and Salem areas. CD3 met Rhodes in 2015 and they immediately formed a partnership. Rhodes recruited CD3 to become a Hoover member and showed CD3 how he could make significant sums of money selling drugs. Rhodes was generous with his drug profits and shared them with CD3 who, in turn, shared his drugs and proceeds with other "little homies" in the Hoovers. CD3 and Rhodes would drive all over the city making drug transactions directly with their customers to maximize profits. They averaged $3,000-4,000 in daily drug proceeds. A long-standing drug customer, K.E., will testify that she purchased heroin from Rhodes on numerous occasions. She also purchased drugs from CD3 and knew Rhodes and CD3 to be working together distributing drugs.

Upon Jones' release from federal custody in 2016, he almost immediately began to sell cocaine and heroin in Eugene. CD5 witnessed Jones selling cocaine and heroin. Jones frequently used CD5's residence to break down the drugs into smaller amounts to sell. CD5 will testify that he later began to purchase wholesale amounts of cocaine to sell from Jones. CD5 estimates that CD5 purchased one to three ounces of cocaine per week from Jones for approximately four to five months. During this time CD5 witnessed other drug dealers purchase drugs from Jones and

**Government's Trial Memorandum**                                                                 **Page 48**

CD5 introduced Jones to a new drug source. CD5 then became in debt due to a lost package of narcotics and Jones threatened CD5 about paying off his debt.

Defendant Jones was caught with a large amount of United States currency on his person after being shot by Vance in November 2017. Again, when arrested in Eugene in January 2018, Jones had a significant amount of cash. On February 3, 2018, during the Brockton Place search warrant related to the Butler murder, investigators located a large amount of cocaine, marijuana, cash, and drug packaging materials at this residence used by Jones.

### 4.  Other Crime that is Not Racketeering

The government also intends to offer evidence of other criminal episodes that do not qualify as racketeering activity such as illegal gun possession and promoting prostitution. Such evidence is relevant to the enterprise purpose of preserving, promoting, and protecting the power, territory, and profits of the enterprise through the use of intimidation, violence, and threats of violence.  Such evidence is relevant to the nature of the enterprise and the common purposes shared by its members.

Under the charged RICO and VICAR statutes, the government must establish that an enterprise existed or would exist and that the enterprise engaged in racketeering activity. *See* 18 U.S.C. §§ 1961(4), (5), 1962(c), (d), 1959(b). As a result, uncharged activity or other acts are generally admissible as direct evidence of the enterprise, including its structure, relatedness, continuity, and the enterprise's racketeering activity. *See, e.g. United States v. Taylor*, 617 Fed. Appx. 671, 673 (9th Cir. 2015) (unpublished) ("None of that evidence was admitted as character evidence, but rather as direct proof of the existence of the RICO enterprise, its method of operation, and the predicate acts of racketeering activity charged in the indictment."); *see also United States v. Palacios*, 677 F.3d 234, 245 (4th Cir. 2012) (rejecting 404(b) notice requirement

**Government's Trial Memorandum**                                    **Page 49**

because bad-act evidence was of acts committed in furtherance of the RICO conspiracy); *United States v. Baez*, 349 F.3d 90, 93–94 (2d Cir. 2003) (rejecting defendant's claim that 16 uncharged crimes should have been excluded because "[i]t is well settled that in prosecutions for racketeering offenses, the government may introduce evidence of uncharged offenses to establish the existence of the criminal enterprise . . . Moreover, where, as here, a conspiracy is charged, 'uncharged acts may be admissible as direct evidence of the conspiracy itself.'"); *United States v. Williams*, 2017 WL 4310712, at *13 (N.D. Cal. Sept. 28, 2017) (uncharged burglary admissible, without 404(b) analysis, because purpose of enterprise included "[p]romoting and enhancing the enterprise and the activities of its members and associates, including, but not limited to ... robbery ... and other criminal activities."); *United States v. Fabel*, 2007 WL 731300, at *1 (W.D. Wash. Feb. 16, 2007) ("to the extent that evidence goes to establish the existence and nature of the enterprise in a RICO action, Rule 404(b)'s prohibition of 'other crimes' evidence does not apply.") (citing *United States v. Salerno*, 108 F.3d 730, 738-39 (7th Cir.1997)).

## IV.    EVIDENTIARY ISSUES

### A.    FRE 1006 – Government Summary Exhibits

To streamline the presentation of evidence for the jury, the government intends to use summary exhibits in its case-in-chief. This will include an overall timeline that summarizes key events during the 30 years covered by the Count 1 RICO Conspiracy (Govt. Ex. 248).[11] Additionally, the government will offer a Summary Call Timeline (Govt. Exh. 149) of contacts

---

[11] In the recent Gypsy Joker RICO trial, the RICO Conspiracy spanned fifteen years from 2003-2018. During trial, Judge Mosman encouraged the parties to offer a timeline because one juror asked to take his notes home in order to "construct a timeline" himself. Trial Tr. (10-28-21) at 2. Judge Mosman said, "[i]f anybody wants to give this jury a timeline, I'm strongly in favor of it. It can be competing timelines, . . . but juries love timelines, and in a case like this, they really love timelines." *Id*.

made between co-conspirators during May 21-22, 2017, the period during the lead-up to the attempted murder of R.H. This summary data was extracted from voluminous phone records from multiple service providers regarding numerous phones. These records, obtained from the subscriber pursuant to subpoena and search warrant, are admissible business records.

Federal Rule of Evidence 1006 permits summaries of voluminous writings, recordings, and photographs. The summary may be in the form of a chart. This rule does not require any type of limiting instruction by the Court. All of the evidence underlying the summary exhibits has been previously provided to the defendants.

In addition, summary charts may be used by the government in its opening statement. Indeed, "such charts are often employed in complex conspiracy cases to provide the jury with an outline of what the government will attempt to prove." *United States v. De Peri*, 778 F.2d 963, 979 (3d Cir. 1985) (approving government's use of chart); *United States v. Rubino*, 431 F.2d 284, 290 (6th Cir. 1970) (same).

### B.    Cell Tower Location Information

In this case, the government obtained historical cell site records for defendants Rhodes and Jones during certain relevant time-periods before and after acts involving murder in 2015 and 2017. Expert witness Special Agent Sean Kennedy (FBI), an expert in mapping cell tower locations, plotted the relevant locations for the phones used by these subjects.  His work is reflected in four Cellular Analysis Survey Team (CAST) exhibits. Govt. Exs. 89 (Att. Murder of D.P.), 120 (Polk Murder), 171 (Butler Murder), 207 (Att. Murder of D.H.). The government provided a summary of his expected testimony in its separately filed Expert Witness Notice (ECF No. 272). The government intends to have Agent Kennedy present a fifth CAST report on the 2017 Attempted Murder of R.H. and L.H. (Govt. Ex. 148), testimony previously anticipated

to be elicited by Gresham Police Detective Wright. For consistency in presentation, the government is opting to present this type of evidence through one expert witness.

### C.    Co-Conspirator Statements (801(d)(2)(E))

Consistent with most RICO prosecutions, the government intends to present a significant amount of co-conspirator statements at trial. Fed. R. Evid. 801(d)(2)(E) provides that statements offered against an opposing party, made by that party's co-conspirator during and in furtherance of the conspiracy, are not hearsay. The Government must prove by a preponderance of the evidence that a statement is a co-conspirator declaration in order for the statement to be admissible under Rule 801(d)(2)(E). *United States v. Schmit*, 881 F.2d 608, 610 (9th Cir. 1989); *United States v. Gordon*, 844 F.2d 1397, 1402 (9th Cir. 1988); *Bourjaily v. United States*, 483 U.S. 171, 176 (1987).

The contents of the declaration, together with independent evidence, may constitute sufficient proof of the existence of the conspiracy and the involvement of the defendant and declarant in it. *Bourjaily*, 483 U.S. at 181; *United States v. Zavala-Serra*, 853 F.2d 1512, 1515 (9th Cir. 1988); *Gordon*, 844 F.2d at 1402. The trial court has discretion to determine whether the government may introduce co-conspirator declarations before establishing the conspiracy and the defendant's connection to it. *United States v. Loya*, 807 F.2d 1483, 1490 (9th Cir. 1987). A district court has the discretion to vary the order of proof in admitting a co-conspirator's statement. *Id*. The court may allow the government to introduce co-conspirator declarations before laying the required foundation under the condition that the declarations will be stricken if the government fails to ultimately establish by independent evidence that the defendant was connected to the conspiracy. *Id.; United States v. Spawr Optical Research, Inc.,* 685 F.2d 1076, 1083 (9th Cir. 1982); *United States v. Fleishman*, 684 F.2d 1329, 1338 (9th Cir. 1982).

**Government's Trial Memorandum**                                                      **Page 52**

Once a conspiracy is shown, the government need present only slight evidence connecting a defendant to the conspiracy in order to introduce an appropriate co-conspirator declaration against the defendant. *United States v. Crespo de Llano*, 838 F.2d 1006, 1017 (9th Cir. 1987); *United States v. Dixon*, 562 F.2d 1138, 1141 (9th Cir. 1977). Declarations of an unindicted coconspirator made in furtherance of the conspiracy may be used against a charged conspirator. *United States v. Nixon*, 418 U.S. 683, 701 (1974); *United States v. Williams*, 989 F.2d 1061, 1067 (9th Cir. 1993). The defendant need not be present at the time the unindicted co-conspirator made the declaration. *Sendejas v. United States*, 428 F.2d 1040, 1045 (9th Cir. 1970).

To be admissible under Fed. R. Evid. 801(d)(2)(E) as a statement made by a co-conspirator in furtherance of the conspiracy, a statement must "further the common objectives of the conspiracy," or "set in motion transactions that [are] an integral part of the [conspiracy]." *United States v. Arambula-Ruiz,* 987 F.2d 599, 607-08 (9th Cir. 1993); *United States v. Yarbrough*, 852 F.2d 1522, 1535 (9th Cir. 1988). Statements made with the intent of furthering the conspiracy are admissible whether or not they actually result in any benefit to the conspiracy. *Williams*, 989 F.2d at 1068; *Schmit*, 881 F.2d at 612. Thus, co-conspirator declarations need not be made to a member of the conspiracy to be admissible under Rule 810(d)(2)(E). *United States v. Lloyd,* 807 F.3d 1128, 1160 (9th Cir. 2015). A co-conspirator declaration need not have been made exclusively, or even primarily, to further the conspiracy. *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989). A statement can be a co-conspirator declaration even if it is subject to alternative interpretations. *Id*.

The Ninth Circuit and several other sister circuits have analyzed the issue in the context of RICO conspiracies and have held that co-conspirator statements are admissible as non-hearsay. *See United States v. Martinez,* 657 F.3d 811, 817 (9th Cir. 2011) (statement by one co-

conspirator about murder he committed was properly admitted as a RICO co-conspirator statement because it advanced the conspiracy's aim to maintain power and "enhanced" that power); *Yarbrough*, 852 F.2d at 1536 (admitting statements made to keep co-conspirators informed of the conspiracy's past, present, and future activities); *see also United States v. Gutierrez*, 48 F.3d 1134, 1137 (10th Cir. 1995) (co-conspirator statements about cocaine deliveries are statements regarding the "ongoing activities of the conspiracy."); *United States v. Dorn,* 561 F.2d 1252, 1256-57 (7th Cir. 1977) (per curiam) ("Statements made to . . . further participation in the group's activities are considered to be 'in furtherance' of the conspiracy."), *overruled on other grounds, United States v. Read,* 658 F.2d 1225, 1236 n. 6 (7th Cir. 1981); *United States v. Ammar*, 714 F.2d 238, 252 (3d Cir. 1983) (admitting statements "which provide reassurance, serve to maintain trust and cohesiveness . . . or inform each other of the current status of the conspiracy"), *United States v. Nixon*, 418 U.S. at 701; *United States v. Williams*, 989 F.2d 1061, 1067 (9th Cir. 1993) (declarations of an unindicted co-conspirator made in furtherance of the conspiracy may be used against a charged conspirator).

In *United States v. Eaglin*, 571 F.2d 1069, 1083 (9th Cir. 1977), the court found statements made to keep co-conspirators abreast of an ongoing conspiracy's activities satisfied the "in furtherance" requirement. In *Eaglin*, one conspirator told a second co-conspirator about receiving "false identification" and cash payments from a third co-conspirator so they would know how to proceed in the future activities of the conspiracy. 571 F.2d at 1083. The court found that "[the] statements were made to . . . induce [a conspirator's] continued participation in the conspiracy, or to allay . . . fears." *Id.*

Statements "made to 'reassure' members of [the] conspiracy's continued existence" are another category of co-conspirator statements that are admissible as statements made in

furtherance of the conspiracy. *Yarbrough,* 852 F.2d at 1535 (citing *United States v. Mason,* 658 F.2d 1263, 1270 (9th Cir.1981)). In *Yarbrough,* one co-conspirator informed several different co-conspirators about details of three separate murders and multiple armored car robberies. 852 F.2d at 1535. The court evaluated the alleged hearsay violation on appeal and held that the statements were admissible under "most, if not all of the standards" such as "induc[ing] . . . further participation in the group's activities[,] . . . prompt[ing] further action on the part of conspirators[,] . . . allay[ing] a coconspirator's fears[, and] . . . [m]ost importantly . . . keep[ing] coconspirators abreast of an ongoing conspiracy's activities[.]" *Id.* at 1535-36 (internal citations omitted). The court elaborated on this last category of statements, those that keep co-conspirators abreast of an ongoing conspiracy's activities, in holding "[i]n particular, [the] statements [were] admissible because they were made with the intent to keep [the] coconspirators abreast of what the [conspiracy] had done, was doing, or would do in the future." *Id.* at 1536.

Courts have interpreted the "in furtherance of" requirement broadly and have considered, among others, the following co-conspirator declarations as being made "in furtherance of the conspiracy": statements made to induce enlistment in the conspiracy, *United States v. Arias-Villanueva*, 998 F.2d 1491, 1502 (9th Cir. 1993); statements made to keep a conspirator abreast of a co-conspirator's activity, to induce continued participation in a conspiracy, or to allay the fears of a co-conspirator, *Id.* at 1502; statements made to prompt action in furtherance of the conspiracy by either of the participants to the conversation, *United States v. Layton*, 720 F.2d 548, 556 (9th Cir. 1983); statements related to the concealment of the criminal enterprise, *Tille,* 729 F.2d at 620 and *Garlington*, 879 F.2d at 283.

Given the broad umbrella under which co-conspirator statements are admissible in RICO cases, the government intends to present witness testimony regarding out-of-court statements

made by Hoover members, and closely allied associates that include, but are not limited to:
membership rules, doing work, intelligence as to rivals, territory; statements amongst members
and associates to ensure compliance and discipline; and statements made to recruit members.
Other statements include those made before, during, and after committing racketeering acts,
statements summarizing these crimes to keep other Hoovers abreast, and statements to evade
detection and prosecution by law enforcement. These statements are not hearsay and are
explicitly excluded from the definition of hearsay provided in Fed. R. Evid. 801.

### D.    Stipulations

The parties are in the process of contemplating stipulations and stipulated trial testimony.
The government hopes to have an update for the Court on this topic at the pretrial conference
during the week of June 21.

### E.    Forfeiture of Firearms

If the jury finds defendants guilty of the Count 1 RICO Conspiracy, the government will
seek to forfeit the three firearms described in that count:

(1) a Glock .40 caliber handgun and associated ammunition seized from SE Lydia Court
    in Portland, Oregon (Overt Act 38)[12]

(2) A Kel-Tec 9mm Luger handgun and associated ammunition seized from SE Lydia
    Court in Portland, Oregon (Overt Act 38); and

(3) A Luger Glock 9mm semiautomatic handgun and associated ammunition seized from
    Brockton Place in Eugene, Oregon (Overt Act 41).

---

[12] If the jury finds defendant Jones guilty on Counts 6 (924c) or 7 (Causing Death through
Use of a Firearm), the government will seek to forfeit the firearm described in these counts, the
same Glock .40 caliber handgun seized from SE Lydia Court in Portland, Oregon.

If defendant requests to retain the jury for the forfeiture phase of the trial, the jury must determine whether the firearms listed in Count 1 falls within the category of property for which forfeiture is authorized, and is thus forfeitable to the United States.

Forfeiture is mandatory in all cases where a criminal forfeiture statute applies. *See United States v. Monsanto*, 491 U.S. 600, 607 (1989). "Forfeiture is an aspect of the sentence, not an element of the underlying crime." *Christensen*, 828 F.3d at 822. Criminal forfeiture may take the form of (1) an *in personam* money judgment against the defendant; (2) forfeiture of specific assets; and (3) forfeiture of "substitute property" if the directly forfeitable assets are unavailable. *United States v. Newman*, 659 F.3d 1235, 1242-43 (9th Cir. 2011).

## 1. Forfeiture Authority

Procedurally, Federal Rule of Criminal Procedure 32.2 governs criminal forfeitures. Substantively, racketeering forfeiture is governed by 18 U.S.C. § 1963. Section 1963 was designed to totally separate a racketeer from the enterprise he operates." *United States v. Busher,* 817 F.2d 1409, 1413 (9th Cir. 1987). In *Busher,* the Court of Appeals for the Ninth Circuit noted that the RICO forfeiture provisions are "purposely broad." 817 F .2d at 1412 (citing *Russello v. United States,* 464 U.S.16, 26-27 (1983) ("[T]he forfeiture provision was intended to serve all the aims of the RICO statute, namely, to punish, deter, incapacitate, and directly to remove a corrupting influence from the channels of commerce.")). Therefore, "[t]he provisions of [RICO] shall be liberally construed to effectuate its remedial purposes." *Rusello,* 464 U.S. at 27.

Section 1963 requires the court to order, in addition to any other sentence imposed, forfeiture to the United States:

(1)  any interest acquired or maintained in violation of Section 1962;

(2) any property affording a source of influence over an enterprise which the [defendant] established, operated, controlled, conducted or participated in the conduct of, in violation of Section 1962[13];

(3) any property constituting, or derived from, any proceeds obtained, directly or indirectly from racketeering activity, in violation of Section 1962.

### 2. Forfeiture Phase of the Trial

Before the jury begins deliberating on defendant's guilt, the Court must determine whether either party wants the jury retained to determine the whether the firearms and ammunition is forfeitable. *See* Fed. R. Crim. P. 32.2(b)(5)(A). Either party may request a jury determination, but that party must make a specific request prior to the jury beginning deliberations on the substantive criminal count. *Id.*; *United States v. Wilkes*, 662 F.3d 524, 549 (9th Cir. 2011). If the jury returns a not guilty verdict, there will be no forfeiture.

If neither party requests a jury determination of forfeiture, a forfeiture hearing may be held at a later date (but before sentencing), to determine if the requisite nexus exists between the firearms and the offense of conviction. The government does not intend to seek a jury determination of forfeiture and will request that the Court make that determination.

If a party requests a jury determination of forfeiture, the parties then may offer additional evidence and argument to demonstrate the nexus between the property at issue and the count of conviction. The jury may rely on evidence introduced during both the forfeiture hearing and the guilt phase of the trial. Fed. R. Crim. P. 32.2(b)(1)(B) (forfeiture determination "may be based

---

[13] This provision applies to property that is used to commit or further a racketeering offense, commonly referred to as an "instrumentality" of the offense or "facilitating property."

**Government's Trial Memorandum**                                    **Page 58**

on evidence already in the record . . . and on any additional evidence or information" submitted during the forfeiture phase).

Although the jury may rely on evidence heard during the guilt phase, the forfeiture proceedings must be separate so as not to distract or influence the jury with considerations of potential punishment. *United States v. Feldman*, 853 F.2d 648, 662 (9th Cir. 1988); *United States v. Dolney*, 2005 WL 1076269, at *10 (E.D.N.Y. May 3, 2005) (forfeiture proceedings separate so as not to distract). All references to forfeiture, including in the jury instructions and argument to the jury on forfeiture, should be reserved until after the jury has returned a guilty verdict.

Because criminal forfeiture is part of sentencing, the Federal Rules of Evidence do not apply at the forfeiture portion of the trial. *See United States v. Smith*, 770 F.3d 628, 641 (7th Cir. 2014). *See also United States v. Overstreet*, No. 1:11-CR-00207-BLW, 2012 WL 5969643, at *17 (D. Idaho Nov. 29, 2012) ("Because forfeiture is part of sentencing, the Rules of Evidence do not apply."). Any evidence that is "relevant and reliable" may be used. Fed. R. Crim. P. 32.2(b)(1)(B). *See also United States v. Ali*, 619 F.3d 713, 720 (7th Cir. 2010) ("the evidence need only be reliable"). Thus, the jury may consider reliable hearsay for purposes of the forfeiture determination. *See, e.g.*, *Smith*, 770 F.3d at 641 (defendant's statements during plea negotiations); *United States v. Ivanchukov*, 405 F. Supp. 2d 708, 709 n.1 (E.D. Va. 2005) (case agent's affidavit); *United States v. Hatfield*, 795 F. Supp. 2d 219, 229–30 (E.D.N.Y. 2011) (expert testimony that did not qualify under *Daubert*).

As a practical matter, the government anticipates that it will not need to adduce any additional evidence or make any additional argument during the forfeiture phase of the trial.

**Government's Trial Memorandum** **Page 59**

After hearing the parties' additional evidence and argument, the jury must decide whether the government has proven by a preponderance of the evidence that the firearms have the requisite nexus to the RICO Conspiracy alleged in Count 1.

If defendant asks to retain the jury, the government will submit proposed jury instructions and a special verdict form for the forfeiture phase. Thus, the jury will resolve the factual elements necessary for forfeiture, but the Court will enter the forfeiture order, styled as a preliminary order of forfeiture. The government will provide a proposed order to the Court. The preliminary order of forfeiture will be final as to defendant's interest in the property when it is incorporated into defendant's judgment of conviction at sentencing.

Dated: June 1, 2022.                              Respectfully submitted,

                                                  SCOTT ERIK ASPHAUG
                                                  United States Attorney

                                                  */s/ Leah K. Bolstad*
                                                  LEAH K. BOLSTAD, OSB #052039
                                                  LEWIS S. BURKHART, OSB #082781
                                                  PARAKRAM SINGH, OSB #134871
                                                  Assistant United States Attorneys